829 F.2d 196
 Ronald E. WAGENMANN, Plaintiff, Appellee,
v.
Russell J. ADAMS, et al., Defendants, Appellees.
Appeal of Gerald R. ANDERSON, Defendant, Appellant.
Ronald E. WAGENMANN, Plaintiff, Appellee,
v.
Russell J. ADAMS, et al., Defendants, Appellees.
Appeal of Edward P. HEALY, Defendant, Appellant.
Ronald E. WAGENMANN, Plaintiff, Appellee,
v.
Russell J. ADAMS, et al., Defendants, Appellees.
Appeal of Francis J. POZZI and Paul Campbell, Defendants,
Appellants.
Ronald E. WAGENMANN, Plaintiff, Appellant,
v.
Russell J. ADAMS, et al., Defendants, Appellees.
 Nos. 86-1475 to 86-1478.
 United States Court of Appeals,
First Circuit.
 Heard May 4, 1987.
Decided Sept. 9, 1987.
 
 Gerard R. Laurence, with whom Milton, Laurence & Dixon, Worcester, Mass., was on brief, for defendant, appellant Gerald R. Anderson.
 Richard R. Eurich, with whom Carol A. Griffin and Morrison, Mahoney & Miller, Boston, Mass., were on brief, for defendant, appellant Edward P. Healy.
 James F. Bergin, Asst. City Sol., with whom Gary S. Brackett, City Sol., Worcester, Mass., was on brief, for defendants, appellants Francis J. Pozzi and Paul Campbell.
 Stewart T. Herrick, with whom Tammy L. Arcuri, Catanzaro, Effren & Herrick, P.C., Ashland, Mass., Alex H. MacDonald, Steven Perlmutter and Harrison & Maguire, P.C., Boston, Mass., were on brief, for Ronald E. Wagenmann.
 Before COFFIN, ALDRICH and SELYA, Circuit Judges.
 SELYA, Circuit Judge.
 
 
 1
 It was early in the seventeenth century when George Herbert wrote:
 
 
 2
 "Marry your son when you will;
 
 
 3
 your daughter when you can."
 
 
 4
 The sagacity of that advice, suspect in any era, was called into grave doubt some three hundred fifty years later in Worcester, Massachusetts. In the process, bitterly-fought litigation ensued. These lawsuits have now wended their rancorous way to our doorstep. Because the underlying circumstances border on the chimerical, we set out an exegetic account.
 
 I. TRAVEL OF THE CASES
 
 5
 The father of the daughter in question, plaintiff-appellee Ronald E. Wagenmann, commenced a civil action in the United States District Court for the District of Massachusetts, asserting a laundry list of civil rights and pendent state tort claims against Gerald Anderson (Anderson), his son Stephen Anderson (Stephen), a state district court judge (whose plea of judicial immunity was later accepted), and several Worcester police officers (including the lead defendant, Adams, subsequently dropped from the case). Wagenmann's federal causes of action under 42 U.S.C. Sec. 1983 stemmed from alleged false arrest, excessive bail, and unlawful commitment to a mental institution. His state law claims were, for the most part, linked to the same averments, e.g., false imprisonment, assault and battery, and intentional infliction of emotional distress. Wagenmann simultaneously brought suit against his quondam court-appointed attorney, appellant Edward P. Healy, for legal malpractice.
 
 
 6
 The cases were consolidated for trial. After six days of courtroom combat, each of the present appellants--Anderson, Healy, officer Francis J. Pozzi, and Lt. Paul Campbell--moved for directed verdicts on all counts. So did the defendant Daniel Egan, Worcester's deputy chief of police. The district court denied these motions, but took the case from the jury as to Stephen Anderson and as to defendants John Brabbs and Stephen Rhieu, both policemen. Except for Egan, Brabbs, Rhieu, Anderson the younger, and the four appellants, all of the other named defendants had departed the litigation, for one reason or another, before the close of trial.
 
 
 7
 On July 18, 1985, verdicts were returned in favor of the plaintiff on his federal civil rights claims for false arrest, excessive bail, and unlawful commitment, and on his tort claims for false imprisonment, intentional infliction of emotional distress, and legal malpractice.[1] The jury returned a defendants' verdict on the assault and battery count, and exonerated Egan on all charges. The jurors awarded $250,000 in compensatory damages against Pozzi, Campbell, and Anderson, jointly and severally, on Wagenmann's federal claim for false arrest. They rendered identical verdicts on Wagenmann's common law false imprisonment claim, and found the same three defendants liable for intentional infliction of emotional distress to the tune of $500,000. They awarded $100,000 against Pozzi under Sec. 1983 relative to the alleged bail manipulation. And, in connection with the civil rights claims generally, they tagged Anderson, Pozzi, and Campbell with punitive damages in the amounts of $50,000, $25,000, and $10,000, respectively. Last but not least, a $500,000 malpractice verdict was rendered against Healy.
 
 
 8
 Following the verdicts, which aggregated some $1,600,000 in compensatory damages and $85,000 in exemplary damages, the defendants all moved for judgments notwithstanding the verdict, Fed.R.Civ.P. 50(b), and in the alternative, for new trials, Fed.R.Civ.P. 59. They maintained that the verdicts were contrary to the weight of the evidence and that the awards were excessive. At the same time, Wagenmann moved to amend or correct the judgment, Fed.R.Civ.P. 59(e), 60(a), (b), arguing that the clerk of court had overlooked the prejudgment interest to which the plaintiff claimed a statutory entitlement vis-a-vis his state law sorties. See M.G.L. ch. 231, Sec. 6B. On January 7, 1986, the district court denied all of the defendants' posttrial motions, and allowed plaintiff's motion for prejudgment interest. The court did, however, condition the denial of new trials on a substantial concession by the plaintiff as to damages. Although it found that the verdicts were not the result of passion and prejudice such as would necessitate an outright new trial, the district court branded the damages as excessive. Accordingly, it ordered remittiturs, the effect of which was to shrink the awards from a total of $1,685,000 to $285,000.[2] In a subsequent order dated October 17, 1986, the district court awarded plaintiff, as the prevailing party, $115,866.50 in attorneys' fees and $10,852.83 in costs as against the losing civil rights defendants (Pozzi, Campbell, and Anderson). See 42 U.S.C. Sec. 1988.
 
 
 9
 The instant appeals challenge both the denial of the defendants' posttrial motions and the fee award. Moreover, Wagenmann has filed a protective cross-appeal, challenging the trial court's exclusion of certain proffered expert testimony anent the malpractice claim.[3]
 
 
 10
 We restate briefly the principles which govern our review. The yardstick by which we take the measure of a refusal to grant a directed verdict is the same as that which we apply to the denial of a judgment n.o.v. Joia v. Jo-Ja Service Corp., 817 F.2d 908, 910 (1st Cir.1987); DeMars v. Equitable Life Assur. Soc. of U.S., 610 F.2d 55, 57 (1st Cir.1979). In conducting that exercise, we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. Miranda v. Munoz, 770 F.2d 255, 257 (1st Cir.1985). Rather, we must examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant. Fishman v. Clancy, 763 F.2d 485, 486 (1st Cir.1985); Cazzola v. Codman & Shurtleff, Inc., 751 F.2d 53, 54 (1st Cir.1984). Put another way, "[w]e take the facts as shown by the [nonmovant's] evidence and by at least such of [movant's] uncontradicted and unimpeached evidence as, under all the circumstances, the jury virtually must have believed." Karelitz v. Damson Oil Corp., 820 F.2d 529, 530 (1st Cir.1987). A judgment notwithstanding the verdict should be granted only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion. Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199 (1st Cir.1980); Harrington v. United States, 504 F.2d 1306, 1311 (1st Cir.1974).
 
 
 11
 Appellants' motions for new trials on grounds which question the sufficiency of the evidence are subject to a different standard of review. In Hubbard, we said:
 
 
 12
 Although a district court judge may order a new trial even though there may be substantial evidence to support the verdict, ... where the trial judge has denied such a new trial motion it is "only in a very unusual case that we will reverse such a ruling as an abuse of discretion." Sears v. Pauly, 261 F.2d 304, 309 (1st Cir.1958). In order to award a new trial ... we must find that the jury's verdict was so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice.
 
 
 13
 626 F.2d at 200. See also Valm v. Hercules Fish Products, Inc., 701 F.2d 235, 237 (1st Cir.1983) (same); Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982) (similar). With these precepts in mind, we proceed to the task at hand, presenting the facts as the jury could have--and seemingly did--find them to be.
 
 II. FACTUAL PREDICATE
 
 14
 Wagenmann, a resident of New York City, is a former New York police officer, a one-time firefighter, and the father of an only daughter (Linda). At the time of the events giving rise to this litigation, Wagenmann and Linda's mother, Yvonne de Bossiere, were married (albeit unhappily). One very real source of friction in the Wagenmann household was Linda's relationship with Stephen Anderson--a match which ultimately produced a serious rift between father and daughter. Following her junior year at Holy Cross College in Worcester, Linda defied paternal preferences and spent the summer with Stephen and his family. In December 1975, her Christmastime visit home was cut short by discord when her father discovered that she was planning to spend New Year's Eve with Stephen while the rest of the Andersons were away.
 
 
 15
 At trial, Wagenmann explained that his strict religious convictions could not allow him to accept the kind of premarital trysting which had sprung up between Linda and Stephen. As a result, hostilities deepened. After Linda's abrupt yuletide departure, Wagenmann made repeated attempts to reach her by telephone at the Andersons' home, but was rebuffed on each occasion. Stephen routinely intercepted the calls and refused to put Linda on the line. Wagenmann warned Stephen that, if access to his daughter was thwarted, he would visit Worcester in person. Stephen responded with the following prophetic threat: "If you come to Worcester, I'll have you arrested.... [My] father is a powerful man in Worcester...." As Linda's graduation from college approached, the tension became ever more marked.
 
 
 16
 In July 1976, Wagenmann learned for the first time that Linda and Stephen were engaged to be married. The wedding was to take place the next month. Yvonne, unlike the plaintiff, had maintained a warm relationship with Linda and had been asked to attend the nuptials. Although Wagenmann was not invited, he claimed to have come to terms with the liaison and to have expressed genuine happiness about the impending marriage. According to Wagenmann, it became his resolve to see Linda on the eve of her wedding, present her with a gift, and attempt to reconcile the differences which had divided them. In Wagenmann's own words, he was trying "to reach out to her one last time." With this thought in mind, he sojourned from New York to Boston on August 18, some four days before the banns were to be read. What awaited Wagenmann in Massachusetts was not reconciliation but instead, a doorway into the twilight zone. His passage through this phantasmagoric portal culminated in his arrest, imprisonment, and commitment to a mental institution.
 
 
 17
 The appellee told Yvonne of his desire to bury the hatchet and of his intended trip. He obtained permission to use her automobile for the trek. Unbeknownst to Wagenmann, however, Yvonne telephoned ahead to tell Linda of her father's surprise visit. According to Yvonne, she called to express a worry about Wagenmann's increasingly erratic behavior. She described a series of disturbing episodes in which Wagenmann voiced threats of violence against Linda and the Anderson family. Although the appellee emphatically denied these accusations and disclaimed any continuing opposition to Linda's marital plans, Yvonne's call nevertheless fomented a fear in Linda that her father might be on the warpath: en route either to carry out his threats against the Andersons or otherwise disrupt the wedding.[4] She decided to stay in Worcester and not to go to her apartment or place of business.
 
 
 18
 Wagenmann arrived in Boston at approximately 5:30 p.m. on August 18. He brought $480 in travelling money, an overnight satchel, and an envelope containing a sizable cash gift for Linda. He proceeded first to Linda's office, but to no avail. He then drove to the apartment which Linda was subletting in Brighton. Upon his arrival, Wagenmann was greeted by her roommate, Debbie Walsh. He identified himself and asked if he might speak with his daughter. Although Debbie knew Linda's whereabouts, she played dumb. The conversation lasted less than five minutes, and ended with Wagenmann agreeing to telephone the apartment at 10:00 p.m. to see if Linda had returned. That call, when made, proved fruitless. It was then that Wagenmann informed Debbie that he would try to locate Linda at the Andersons.
 
 
 19
 Sometime during the evening of August 18, Debbie Walsh telephoned the Anderson home. She spoke first with Gerald Anderson and moments later with Linda, each time expressing concern that Wagenmann might be on his way to Worcester. At trial, Anderson testified that Debbie warned him that Wagenmann had uttered death threats against Linda and the Andersons, and had openly resolved to put a stop to the wedding (literally) at any cost. Wagenmann flatly denied these allegations. Debbie, herself, was unable to remember whether or not the appellee had ever made any such threats.[5] Linda, too, failed directly to support Anderson's claim anent threats of violence. While acknowledging that Debbie told her of Wagenmann's forecast that "there [would] be no wedding," Linda could not remember ever hearing (other than from Yvonne) about threats pronounced by her father.
 
 
 20
 Be that as it may, the story circulated--with Anderson's help--that Wagenmann was en route to Worcester with homicide on his mind. One report had him planning to detonate the Andersons' house by means of explosives. Another version suggested that he had promised to shoot Linda and watch "the blood flow on her wedding dress." Neither of these accounts were substantiated by a shred of competent evidence at trial. Anderson made no effort to separate the wheat from the chaff. He decided instead to take matters into his own hands. He obtained Egan's unlisted home telephone number, rang up the deputy chief, related the erratic behavior and monstrous threats which had been attributed to the plaintiff, and requested police protection. Egan lost no time in dispatching Lieutenant William O'Leary to investigate. Although Egan made no inquiry into Anderson's supposed sources of information, his instructions to O'Leary were appropriately confined: O'Leary was to locate Wagenmann and "ascertain his intentions." According to both Egan and O'Leary, the appellee was not to be arrested on the basis of Anderson's hearsay accusations alone, but was to be stopped and questioned, and his dangerousness vel non independently determined. No arrest warrant was sought or obtained.
 
 
 21
 O'Leary thereupon dispatched officer Pozzi to the Anderson home to "conduct an investigation." Other patrolmen were told to keep a lookout for Wagenmann's vehicle. After reaching the house, Pozzi found Anderson there with Stephen and Linda, and spoke with each of them. He listened to their accounts of Wagenmann's behavior--including their musings that the plaintiff had driven to Massachusetts with the express purpose of killing his daughter and dynamiting the Anderson dwelling. Pozzi then telephoned Yvonne, who confirmed that the plaintiff had permission to drive her car.[6] After observing what he interpreted as fear on the part of the persons he interviewed, Pozzi convinced all of them--Gerald, Stephen, and Linda--to leave the premises until the plaintiff was apprehended.
 
 
 22
 Pozzi later conceded that much of the "information" he acquired rested on second and third hand reports. Yet, he made no meaningful effort to verify the truth of the horror stories or to procure more reliable evidence. The simple expedient of placing a telephone call to Debbie Walsh, for example, would have gone a long way toward corroborating or discrediting the factual basis for the entire investigation. But Pozzi eschewed all such inquiries. From the tenor of his trial testimony, a jury could reasonably have concluded that the officer's sole concern was to allay the fears (however unfounded) of a well-connected family that anticipated trouble at an upcoming wedding.
 
 
 23
 Wagenmann arrived in Worcester at about eleven o'clock that night, and began searching for the Anderson homestead. Pozzi spotted his car and called for assistance. Within minutes, a battery of police cruisers converged and brought the vehicle to a stop. Wagenmann was ordered to disembark and was promptly handcuffed. The arresting officers included Pozzi and Campbell. The latter (who held the rank of sergeant in 1976) testified at trial that the arrest was a "joint venture" between Pozzi and himself. According to the plaintiff, Campbell and another officer pointed their revolvers at him, and Campbell repeatedly shouted, "Move and I'll blow your head off." Wagenmann had no idea why he was being detained, but claims (understandably) to have been scared witless. Pozzi reminded Campbell that the suspect might be armed--whereupon the sergeant pushed Wagenmann against the car, rifled his pockets, and threw all of his belongings (including the vehicle's contents) onto the roadway. Campbell then examined the car's interior more carefully, while a fellow officer searched the vehicle's trunk. Significantly, these warrantless searches unearthed no weapons or incendiary devices of any kind. But, this telltale deterred no one. Notwithstanding the glaring absence of evidence to suggest wrongdoing, the officers heaved Wagenmann into a cruiser and took him to precinct headquarters.
 
 
 24
 With respect to an investigation at the scene, Pozzi acknowledged that "basically there was none." He conceded the gendarmes' primary concern to have been that threats were supposedly uttered and plaintiff might be prepared to act upon them. When Wagenmann asked about the reasons for the arrest, Pozzi stonewalled. Rather than answering a perfectly plausible question, he screamed, "I know all about you.... I know why you're here and I know what I'm going to do with you." After Wagenmann reached the station, he learned for the first time that he purportedly intended "to shoot the Andersons," and that the police had collared him for that reason. Then, although Wagenmann was never asked to produce license or registration, Pozzi issued a citation (marked "Complaint") which charged him with driving without a valid operator's license or registration. When the plaintiff protested that these materials were in his possession, Pozzi rejoined: "You understand, we just can't let you go."
 
 
 25
 Once the motor vehicle citation had issued, Wagenmann--far too sanguine, as matters turned out--assumed that his custody would be short-lived. Within moments, he was rudely disabused of this happy notion; Pozzi informed him that he was being placed under arrest for disturbing the peace. Rhieu, Pozzi, and Campbell admitted at trial, however, that the plaintiff had done nothing in their presence to breach the peace or resist arrest. Indeed, the officers openly acknowledged that the rumored threats were the root cause underlying Wagenmann's arrest.[7] Nor was the vise of custody facilely to be loosened. When plaintiff asked Pozzi to arrange for bail, the detective responded, "You have $480 and the bail is $500." Although Pozzi maintains that he exercised no control over the setting of Wagenmann's bail, portions of his trial testimony suggest otherwise:
 
 
 26
 Q: Mr. Wagenmann ... was not brought to your knowledge before either a bail bondsman or a magistrate, was he?
 
 
 27
 A: I called to set bail; for him to have bail set for him.
 
 
 28
 Q: Isn't your first statement more correct; you called to set bail for him?
 
 
 29
 A: I called to arrange bail for him.
 
 
 30
 Pozzi later attempted to clarify these answers in manner following:
 
 
 31
 A: I called [the clerk of court] and told him that we had the gentleman under arrest, he was being charged with the various charges, and there was a question about what he had for cash, and I told [the clerk] that I was going to recommend to the court that this man be held for examination because of his behavior. [The clerk] set bail at $500.
 
 
 32
 These revised statements do little to dispel the inference that Pozzi was involved, directly and effectively, in the formulation of bail.
 
 
 33
 After a bleak and unsettling night in prison, Wagenmann was arraigned at the state district court. While the plaintiff was present in the courthouse, but not in the courtroom, Pozzi approached the sidebar. The officer recommended to Judge Luby, then presiding, that the appellee be committed for a psychiatric examination. Pozzi testified at trial that his recommendation flowed from the Andersons' fears that, if released, Wagenmann would carry out acts of violence. Pozzi left the state courtroom on this note. Thereafter, Wagenmann was examined at the court's initiative by a psychiatrist, Dr. David Myerson. Forewarned to expect a bellicose individual, the physician instead found the plaintiff to be "a very pleasant man; cooperative, intelligent, denying everything in any way that I could question him, showing no signs of mental illness whatsoever." In Dr. Myerson's view, "he was clearly competent."
 
 
 34
 The psychiatrist reported these findings. He was then confronted by Judge Luby, who maintained that Wagenmann was dangerous and homicidal. Myerson protested, but in vain; the judge told him that, if Wagenmann went out and did anything, he would be held responsible. It was under this sort of duress that Myerson reluctantly agreed to sign a form stating the opinion that the plaintiff should be admitted to the hospital for observation.
 
 
 35
 It was on this same day that Healy made his debut. The attorney, whose practice was based in Worcester, was attending the state district court on other business. No neophyte, Healy had enjoyed some thirty years of extensive trial practice, including criminal law experience. That afternoon, Judge Luby appointed him to represent Wagenmann. Healy entered a general appearance on Wagenmann's behalf in connection with both the commitment proceedings and criminal charges. Healy, let there be no mistake, was also representing his client in respect to bail.
 
 
 36
 The lawyer spoke with Wagenmann on three or four occasions through the bars of a holding cell at the courthouse, for a total of an hour at most. During their first meeting, Healy introduced himself as a court-appointed attorney. As Wagenmann recalled it, Healy never inquired as to what had happened, but did say that he was a friend and fellow parishioner of Anderson's. Wagenmann, taken aback, told Healy to get him another lawyer. Healy refused. During this meeting and subsequently, the plaintiff asked to be brought before a judge. The attorney ignored these requests, claiming later that Wagenmann would have "hung himself" had he appeared in open court.
 
 
 37
 At one point, Healy suggested that he could have Wagenmann released if the appellee would immediately board a bus to New York. Wagenmann rejected this proposition. Healy, unhappy, departed. When he returned, he informed his client that "[t]he deal is that you have to commit yourself to the mental hospital." Wagenmann became very upset and countered, "I can't do that." According to Wagenmann, Dr. Myerson, who was present at the time, said, "I wouldn't allow it. There is nothing wrong with you." Healy advised Wagenmann, "[m]aybe in New York you're something, but up here, you're nothing." Healy then walked away.
 
 
 38
 Wagenmann was thereafter informed by his counsel that--without any personal appearance before Judge Luby--he had been committed to a mental hospital for a twenty day observation period. Just before Healy departed the courthouse, leaving Wagenmann sitting alone in his cell, the following farewell occurred:
 
 
 39
 Wagenmann: "You can't do that."
 
 
 40
 Healy: "That's what you think."
 
 
 41
 Wagenmann was then confined to Worcester State Hospital (WSH), where he was placed in a secure, locked ward for disturbed persons. Having arrived too late for supper, Wagenmann was forced to go without food. He was not permitted to take a shower without supervision. Having been warned that the inhabitants of his ward were not responsible for their actions, the plaintiff sat in a corner, with the wall behind him, close to the orderlies' station. At trial, he described his ordeal as follows:
 
 
 42
 That's where I spent the night, with these disturbed patients walking around, looking at me, and would come up and start asking questions, and I totally ignored them, with the fear that if I said something wrong to them, they would do harm to me....
 
 
 43
 I never got out of that chair for the whole night, and these people wandered around. These people don't sleep like we go to sleep at night, these people wander around. They are always walking around. They are seated in the hallway. They sit next to you and they mumble to themselves and they come by and look at you and mumble. It's a frightening situation, especially when you're sane.
 
 
 44
 When he first arrived at WSH, Wagenmann had been interviewed by Dr. Lorenz, a psychiatrist. The examiner found no cause for commitment. Lorenz told him that "the only reason you are being committed is because of this court order." The next morning, he was visited by Dr. Myerson, three other psychiatrists, and a WSH staff member. Myerson, apologizing profusely for what had happened, then called Chief Judge Gould of the state district court. It was Judge Gould who, after this discussion, arranged for Wagenmann's immediate release on personal recognizance. The appellee, free at last, reclaimed his personal belongings (including $480 in cash) and boarded a bus bound for New York. Shortly thereafter, Judge Gould dismissed all three pending criminal complaints against Wagenmann.
 
 
 45
 The plaintiff claimed at trial that, in the aftermath of his imprisonment and involuntary commitment, he has been stigmatized. He lives in perennial fear that acquaintances, prospective employers, and others will discover that he had been committed. He has refused employment out of apprehension that performance of a routine security check would unearth this tawdry episode. And, as Wagenmann sees it, a battered self-image left scarred by this bizarre experience has made the establishment of new relationships difficult.
 
 III. ARREST AND IMPRISONMENT
 
 46
 As previously mentioned, the jury found against appellants Pozzi, Campbell, and Anderson on false arrest, actionable under the federal civil rights statute, and on the common law false imprisonment count. Under either theory, the root inquiry with respect to liability is whether the police had legal justification to detain the plaintiff.
 
 
 47
 In Massachusetts, state law requires that there be "reasonable grounds" for the detention. Coblyn v. Kennedy's, Inc., 359 Mass. 319, 322, 268 N.E.2d 860 (1971). In the precincts patrolled by Sec. 1983, the fourth amendment creates a right to be free from unreasonable seizure of the person, see, e.g., Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), thereby demanding that arrests be supported by "probable cause." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964). The Massachusetts Supreme Judicial Court has held that the terms "reasonable grounds" and "probable cause" have a virtually identical connotation. Coblyn, 359 Mass. at 325, 268 N.E.2d 860. We agree that these claims are substantively overlapping, see Hall v. Ochs, 817 F.2d 920, 926 (1st Cir.1987), so we discuss them in the ensemble.
 
 
 48
 As we have had recent occasion to note, "the constitutionality of a warrantless arrest 'depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it--whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [[arrestee]] had committed or was committing an offense." United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir.1987) (citation omitted). A fair, reasonable probability that criminal activity is taking or has taken place--determined under an objective standard--is the constitutional minimum for an arrest executed in the absence of an antecedent warrant. Id. at 1023-24, and cases cited therein. Mindful of these prudential principles, we have little difficulty in rejecting the proposition that Wagenmann's arrest on August 18, 1976 was cloaked in constitutionally suitable raiment.
 
 
 49
 The officer-appellants argue that they had probable cause to arrest the plaintiff three times over: for the motor vehicle violation, for threats made against the Andersons, and for disturbing the peace. We have scrutinized these contentions and find them to be spavined. We concur in the district judge's conclusion that the jury was, at the very least, entitled to reject these supposed bases for the arrest as pretextual. Few things in this case are necessarily black or white; and on this chiaroscuro record, the factfinders were entitled to conclude--as they evidently did--that Wagenmann was arrested because of apprehension as to what he might do to disrupt Linda's wedding and because of a desire to appease Anderson. What is equally as important, those motives could supportably be found to have dictated the scenario, notwithstanding the utter lack of solid evidence to substantiate the former concern and the utter lack of any legitimate reason to venerate the latter sentiment. We look briefly at each set of charges.
 
 
 50
 A. The Motor Vehicle Violation. With respect to the purported motor vehicle violation, the officer-appellants cite M.G.L. ch. 90, Sec. 21 as the basis for Wagenmann's arrest. At the pertinent time, the statute authorized police officers to make warrantless arrests of persons who, while violating any motor vehicle law, failed to carry a valid operator's license "granted ... by the registrar." According to Pozzi and Campbell, Wagenmann broke the law by neglecting to have the registration certificate for Yvonne's automobile either on his person or in the car. And this bevue, they urge, ripened into an arrestable offense (for which no warrant was required) when the appellee could not produce a valid driver's license issued by the registrar of the Commonwealth of Massachusetts. The argument is fatuous.
 
 
 51
 In the first place, Wagenmann testified that he had the registration certificate at the time of his arrest. Although the police officers (and Yvonne de Bossiere, for that matter, see supra n. 6) disputed this fact at trial, it was the jury's role to assess the credibility of witnesses and to resolve inconsistencies in the evidence. See United States v. Cintolo, 818 F.2d 980, 989 (1st Cir.1987). Given the huge disparities in the evidence on a broad range of issues in this litigation, the jury's apparent conclusion that Wagenmann was taken into custody not because of the missing registration, but despite his actual possession of it, seems an altogether permissible one.
 
 
 52
 Yet, there is more. Whether or not Wagenmann lacked the paperwork required by M.G.L. ch. 90, Sec. 11, he could in no event have been subject to warrantless arrest on this score. M.G.L. ch. 90, Sec. 21 embodies a two-part test: the statute allows lawmen to arrest one who (i) has no valid driver's license and (ii) violates any motor vehicle statute, ordinance, or regulation. Here, the first prong was totally unproven. Although the defendants argue (accurately, it would appear) that Wagenmann had no Massachusetts operator's license, he nevertheless had an (admittedly valid) New York operator's license when arrested. That was enough. While Sec. 21 references licenses "granted ... by the registrar," that reference cannot plausibly be read to require all who drive within the commonwealth to possess licenses issued by the Massachusetts registrar. Passing the stark fact that such an application of the statute would likely contravene a variety of federal constitutional protections, then-extant state law was to the contrary. See M.G.L. ch. 90 Sec. 10, set forth in relevant part in the margin.[8] Inasmuch as it was undisputed that the plaintiff had on his person a proper New York license when arrested and Yvonne's car (which he was then driving) was registered in that state, Sec. 10 by its terms held him harmless on the first aspect of the Sec. 21 test. Thus, Sec. 21 could not validly have supplied the justification for Wagenmann's warrantless arrest.
 
 
 53
 B. The Threats. We turn next to the question of whether Pozzi and Campbell had probable cause to orchestrate an arrest based on the threats allegedly uttered by the appellee. The officer-appellants pin their hopes in this respect on M.G.L. ch. 275, Secs. 2, 4, which make it a misdemeanor in Massachusetts to threaten to commit a crime against the person or property of another. The statutory framework is of scant solace, however, for it requires that a complaint be submitted to and reviewed by a judicial officer, M.G.L. ch. 275, Sec. 2, and that a warrant issue from such court, M.G.L. ch. 275, Sec. 3, before any arrest may be conducted thereunder. Neither of these preconditions was met here. It follows inexorably that Wagenmann's purported uttering of threats--a matter which, like his nonpossession of a motor vehicle registration, see supra, was hotly disputed at trial--could not have formed a valid basis for his warrantless arrest by the Worcester police.[9]
 
 
 54
 C. Disturbing the Peace. Finally, the officers defend the decision to take Wagenmann into custody by pointing to their "good faith belief" that a breach of the peace had been committed.[10] The burden of this argument is that the plaintiff's presence near the Anderson residence, coupled with the reported threats of violence, coalesced to discompose the peace and supply probable cause for arrest. The argument proves too much. In Massachusetts, disturbance of the peace, a misdemeanor under M.G.L. ch. 272, Sec. 53, must occur in the presence of a police officer in order to constitute an arrestable offense. M.G.L. ch. 231 Sec. 94A. See also Commonwealth v. Gorman, 288 Mass. 294, 297, 192 N.E. 618 (1934). Yet, Wagenmann did nothing in the company of the gendarmerie which could be characterized as even a genteel breach of decorum. He was present at a public place where he had an unqualified right to be. Even if he had theretofore uttered threats--and on this point, the evidence was at best conflicting--such comminations were assuredly not voiced within earshot of the police, much less in their presence. Thus, any purported saber rattling could not have supplied a legitimate predicate for Wagenmann's arrest.
 
 
 55
 Once the air has been cleared of post hoc rationalizations, it becomes rather plain that the plaintiff was arrested because a local family of some influence claimed he had threatened them and were fearful that his unwanted arrival might portend problems for an upcoming wedding. The hearsay information passed to Pozzi and Campbell furnished, perhaps, such reasonable suspicion of crime as would justify an investigation into the plaintiff's appearance in the vicinity of the Anderson home. As part of this investigation, the police would presumably have been authorized to stop Wagenmann, question him, and perform an exterior frisk of his person. See Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). And if any substantially incriminating evidence eventuated--that is, if "suspicion" matured into "probable cause"--the officers could have proceeded accordingly. Though such a progression might well pass muster, the jury could have found that what happened here was considerably different: that regular procedures were spurned in this instance and that the conduct of the officer-appellants greatly exceeded the bounds of what they were constitutionally empowered to do. They arrested Wagenmann without cognizable cause, handcuffed him, rifled his pockets, and searched his car (including its locked trunk), without so much as a morsel of hard evidence or a shred of probable cause.
 
 
 56
 The appellants lay great stress on their expectation that Wagenmann might be armed and dangerous as a justification for their behavior. Yet, even were such fears sufficiently reasonable to validate the automobile search, see Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983) (limited protective search of automobile allowable where police have reasonable belief that suspect could gain immediate access to weapons), that infrastructure necessarily collapsed when the search produced absolutely no evidence of weaponry or explosives. Once Pozzi and Campbell realized that Wagenmann lacked the means necessary to effectuate the threats which had been ascribed to him, detention on that score could not be justified. Instead of setting Wagenmann free, however, the officer-appellants tightened the screw: they subjected him to a full custodial arrest and to groundless imprisonment. In the process, they left ample room for a factfinder to conclude that they intentionally violated Wagenmann's fourth amendment rights against unreasonable search and seizure, as well as his state common law privilege not to be falsely imprisoned.
 
 
 57
 D. Qualified Immunity. Pozzi and Campbell essay one last challenge to the adverse verdict on the Sec. 1983 claim. They say that they were qualifiedly immune under the doctrine of Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The exhortation need not occupy us for long. When applying Harlow, we are "concerned not with the correctness of defendants' determination, on the one hand, nor their subjective state of mind, but [with] the 'objective reasonableness' of their conduct.... Harlow demands not prescience, but objective good faith." Hall v. Ochs, 817 F.2d at 924 (quoting De Abadia v. Izquierdo Mora, 792 F.2d 1187, 1193 (1st Cir.1986)). Since reasonable police officers are expected to know the law, we focus our inquiry on whether the officers' conduct on August 18, 1976 violated "clearly established ... constitutional rights." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 
 58
 Thus posed, the question virtually answers itself. The right to be free from unreasonable seizures of the person was well established long before 1976. See, e.g., Sibron v. New York, 392 U.S. 40, 59-66, 88 S.Ct. 1889, 1900-04, 20 L.Ed.2d 917 (1968); Hall v. Ochs, 817 F.2d at 923. Moreover, what happened here involved more an egregious trespass into constitutionally well-marked terrain than an accidental inching across some vaguely-defined legal border. "The contours of the right" were, in this instance, "sufficiently clear that a reasonable official would understand that what he is doing violates [the] right." Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). No prudent police officer in Pozzi's or Campbell's shoes could have failed to recognize that arrest and imprisonment on the flimsy basis of unsubstantiated hearsay and self-interested rumor would strike a mortal blow at Wagenmann's civil rights. The same is equally true--perhaps more so--of what the jury apparently believed were trumped-up paperwork charges pertaining to a purported infraction of the motor vehicle code. The district court's refusal to treat the defense of Harlow immunity as dispositive of the Sec. 1983 claims against the officer-appellants cannot seriously be faulted. Cf., e.g., Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 1096-98, 89 L.Ed.2d 271 (1986) (police officers applying for a warrant are immune only if a reasonable lawman could have believed there was probable cause to support the warrant application); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (officials not immune if their actions were "clearly proscribed" by existing law); Emery v. Holmes, 824 F.2d 143, 149-50 (1st Cir.1987) (no qualified immunity for seizure which "violated well established Fourth Amendment principles").
 
 
 59
 In sum, as to the liability aspect of the claims against Pozzi and Campbell for civil rights violations and for common law false imprisonment, the district court did not err in denying the officer-appellants' alternative motions for new trials or for judgments n.o.v.
 
 
 60
 E. Anderson's Defenses. The verdict returned against Anderson on these counts stands on a different, less sturdy, footing. His sufficiency challenge presents a surpassingly close question. Our examination of the trial record, however, reveals enough evidence--though barely--from which a jury, drawing all permissible inferences favorable to the claimant and resolving all credibility questions in the same manner, could reasonably have fastened liability upon this appellant with regard to false arrest and imprisonment.
 
 
 61
 Inasmuch as Anderson is and was a private citizen, liability under 42 U.S.C. Sec. 1983 requires a showing that he collogued with state actors--persons acting under color of state law--to deprive the plaintiff of his civil rights. See Dennis v. Sparks, 449 U.S. 24, 27-28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of Sec. 1983 actions."). Accord Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605-06, 26 L.Ed.2d 142 (1970); United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966). As the district court told the jury in its charge, "[a] Sec. 1983 defendant need not be an officer of the state. It is enough if he is a willful participant in joint activity with the state or its agents."
 
 
 62
 Anderson's posture is somewhat the same vis-a-vis the common law claim. He did not participate directly in Wagenmann's confinement either at the Worcester police station or thereafter at WSH. If he is liable at all for the tort of false imprisonment, his guilt must rest on evidence that he conspired with the police or acted in a way purposefully calculated to bring about the unlawful incarceration. See 32 Am.Jur.2d False Imprisonment Secs. 42 ("Persons other than those who actually effect an imprisonment may be so related to the act or proceeding as instigators or participants therein as to be jointly liable, for all who aid, direct, advise, or encourage the unlawful detention of a person are liable for the consequences."), 45 ("[T]he arrest by the officer must be so induced or instigated by the defendant that the act of arrest is made by the officer, not of his own volition, but to carry out the request of the defendant.").
 
 
 63
 We note, first, that there was considerable circumstantial evidence to suggest that Anderson exerted influence on the authorities to have Wagenmann removed from circulation. Viewed dispassionately, the proof warranted an inference that Anderson sought Wagenmann's apprehension not out of fear for the personal safety of his loved ones, but out of the apparently misguided concern that Wagenmann might have come to Worcester to disrupt Stephen's wedding. We agree entirely with this appellant's premise that merely initiating a good-faith request for police protection would not attach liability for the subsequent unconstitutional conduct of arresting officers. See, e.g., Burnham v. Collateral Loan Co., 179 Mass. 268, 274, 60 N.E. 617 ("Such a person does no more than his duty; and to hold him answerable ... for the result of the mistake or misconduct of the officer would be to make the division line of compromise between the right of the individual to his liberty and the right of the public to protection trench too far upon the domain of the latter."); see also 32 Am.Jur.2d False Imprisonment Sec. 45 ("Merely summoning or calling on an officer for protection against a disturbance or trespass or to keep the peace, or to deal with a person accused of crime, is not sufficient participation to impose liability...."). That tenet, however, does not carry the day, since the evidence presented in this case, albeit largely indirect, adequately supports the conclusion that Anderson was not a "mere complainant," but was implicated in Wagenmann's arrest and imprisonment to a more significant and blameworthy degree.
 
 
 64
 In the first place, it was shown that Anderson and Egan were at least friendly social acquaintances. It was this rapport with the deputy chief which allowed Anderson to bypass regular police emergency procedures when the first whiff of trouble wafted westward. Anderson did not hesitate to use Egan's unlisted telephone number and to reach him at the odd hour at home. That a private citizen felt free to contact the deputy chief of the city's police department at an unpublished telephone number, while the latter was off duty, lends a certain credence to Stephen's warning--voiced to the plaintiff in late 1985--that Anderson was a powerful figure in Worcester and could have Wagenmann arrested at will.[11]
 
 
 65
 In addition, Anderson acknowledged that he notified the police in order to secure their assistance in intercepting appellee. He testified that Debbie Walsh had warned him about Wagenmann's menacing statements, and that he feared for his family's safety. Notably, however, the police report (prepared by Pozzi) contained no reference to Anderson's ostensible fright, but addressed itself solely to the concern that "the wedding might be disrupted." The other witnesses failed to confirm either Anderson's version of Debbie's call or the mouthing of threats by Wagenmann at the time in question. This evidence, combined with the plaintiff's firm denial that he had ever used fighting words, furnished sufficient reason to conclude that Anderson was, at the very least, exaggerating his claimed fears. The jury could well have inferred that this defendant, bound and determined to see the nuptials occur as planned and without distraction, had woven the garment of contemporaneous threats out of whole cloth and had callously attributed the stitching to Linda's estranged father.[12]
 
 
 66
 Then, too, Pozzi described the investigation in such a way as to permit a finding that the decision to arrest Wagenmann was a collective one, made by him and the Andersons in concert, rather than solely an official one. It could be inferred that the cadre of decisionmakers reached this consensus well before the plaintiff set foot in Worcester. Pozzi testified that, after consulting with those present in the Anderson home on the night of August 18, they (Anderson included) "came to a conclusion" and "carried out what we had to do" (emphasis supplied). In context, this was not the royal "we" or the editorial "we," but applied logically to a plan of concerted action worked out by the officers and Anderson. Certainly, an inference to that effect was sustainable. Such an illation, if the jury chose to draw it, was buttressed when Pozzi told Wagenmann: "You understand we just can't let you go." The comment was made after the illegitimacy of Wagenmann's detention had--or should have--become apparent, and the implication to be drawn is that Pozzi and the Worcester police felt constrained to jail the plaintiff notwithstanding the absence of any legal basis to do so.
 
 
 67
 We end this exercise by remarking the settled principle that circumstantial evidence can support a finding of concerted action. E.g., United States v. Notarantonio, 758 F.2d 777, 789 (1st Cir.1985); United States v. Marsh, 747 F.2d 14, 15 (1st Cir.1984); United States v. DeLutis, 722 F.2d 902, 905 (1st Cir.1983). When the foregoing collocation of evidence is considered as a whole, we think that a jury could reasonably have found that Anderson was not a "mere complainant;" that, to the contrary, he possessed and exerted influence over the Worcester police, and conspired with them to have Wagenmann arrested and kept under wraps in order to safeguard his son's wedding from unwanted intrusions. The district judge, in denying Anderson's posttrial motions, wrote that "a juror could have reasonably believed that ... there was a 'meeting of the minds' of Mr. Anderson and the police officers and that Mr. Anderson gave a 'direct or implied command' to the police to arrest Mr. Wagenmann and deprive him of his civil rights." We concur. Having reviewed the record with care, we find it adequate to support liability in this instance.
 
 IV. EXCESSIVE BAIL
 
 68
 Appellant Pozzi challenges that portion of the jury's special verdict which found that he had violated Wagenmann's eighth amendment right to be free from excessive bail, and awarded damages therefor under 42 U.S.C. Sec. 1983. Pozzi's remonstrance is essentially trichotomous: he claims that he had no control over the setting of bail; that the bond set ($500) was moderate under the circumstances; and that the appellee, who claimed to have had close to $1500 in his immediate possession at the time of these events, cannot complain of any adverse consequences flowing from bail in any lesser amount. We treat the first of these assertions independently, and group the remainder. When all is said and done, we find none of the theories persuasive.
 
 
 69
 A. Lack of Control. To be sure, police officers are not statutorily authorized to set bail in Massachusetts, see M.G.L. ch. 276, Sec. 58 (designating responsibility for bail to "[a] justice or a clerk or assistant clerk of the district court, a bail commissioner or master in chancery"). Nevertheless, if a person wrongfully brings about an end by manipulating another, the naked fact that he lacked statutory power to accomplish the end by himself does not provide an impenetrable shield. The law looks to causation in fact, not to the arrangement of links in some purely decorative daisy chain.
 
 
 70
 In this case, a plenitude of evidence was offered to suggest Pozzi's intimate involvement in the bail decision. Pozzi admitted that he telephoned the court clerk "to set bail." In so doing, he described the nature of the "various charges," the amount of money on Wagenmann's person, and the like. Pozzi admitted that he intended to recommend commitment. Additionally, there was proof that, when the appellee requested bail, Pozzi rebuffed the entreaty by saying "You have $480 and the bail is $500."
 
 
 71
 It takes little imagination to fathom how a jury could reasonably infer from this evidence that the policeman did not merely arrest Wagenmann and then step aside, letting an independent judicial officer set bail. Compare, e.g., Basista v. Weir, 225 F.Supp. 619, 623 (W.D.Pa.1964), aff'd in part, rev'd in part on other grounds, 340 F.2d 74 (3d Cir.1965). The record strongly implies that Pozzi did appreciably more: helping to shape, and exercising significant influence over, the bail decision. Pozzi's version of the facts, his description of the charges, and his characterization of the plaintiff's access to a cash sum certain contributed materially to what eventuated with respect to bail. All of these, the jury may allowably have believed, were shaded to bring about the outcome which the arresting officer coveted. Accordingly, the finding that this appellant proximately caused bail to be set as it was rested on adequate evidence. Cf. Bretz v. Kelman, 773 F.2d 1026, 1030-32 (9th Cir.1985) (en banc) (false accusation in one matter, leading to denial of bail in unrelated criminal case, can support Sec. 1983 cause of action).
 
 
 72
 Before leaving the point, however, we must also address the officer-appellant's assertion that he is insulated from liability for overly high bail because the court clerk (qua bail commissioner) was positioned between the arresting officer and the prisoner. At bottom, Pozzi's construct funnels into the rather unlikely claim that the actions of the clerk were a superseding cause of any civil rights violation anent bail. We disagree. That it was necessary for the officer to work his will through the court clerk, rather than single-handedly, does not automatically immunize his behavior. Section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. at 187, 81 S.Ct. at 484. Recently, in Springer v. Seaman, 821 F.2d 871, 877 (1st Cir.1987), we endorsed the use of traditional tort principles for making intervening cause determinations in the Sec. 1983 milieu. Specifically, we adopted the approach encompassed by Restatement (Second) of Torts Sec. 442 (1965), which provides:
 
 
 73
 The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:
 
 
 74
 (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
 
 
 75
 (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
 
 
 76
 (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
 
 
 77
 (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
 
 
 78
 (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
 
 
 79
 (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.
 
 
 80
 Applying these principles to the case at bar, it is readily apparent that the court clerk's exercise of his statutory authority was in no way a superseding cause of the excessive bail with which Wagenmann was saddled. Pozzi, as the initiator of official bail activity and the clerk's lone source of information about the arrestee, was in all probability the cause of the ruling made by this intervening agent. By the same token, the clerk's reliance on the facts and recommendation furnished to him by Pozzi was routine--to be expected by all concerned. And most significantly, the type of harm which eventuated (the setting of bail at a level apparently calculated to keep the appellee off the streets of Worcester) was, the jury could have found, precisely the outcome sought by Pozzi. So, the first three Restatement considerations conjoin in this case.
 
 
 81
 While it is true that the court clerk's involvement in the bail process tilted the fourth of the Restatement factors towards the appellant, the fifth and sixth factors (the clerk was lawfully performing his job and, under the circumstances, doing so in a non-culpable manner) militated against him and thereby overbalanced the fourth. On the Restatement latticework, the jury had ample rope to hang Pozzi as the person proximately responsible for Wagenmann's excessive bail. There was room, likewise, to determine that the causal nexus was not fractured by the court clerk's role in the actual setting of bail. See generally Malley v. Briggs, 106 S.Ct. at 1098 n. 7 (Sec. 1983 recognizes causal link between policeman's action in applying for warrant and ensuing arrest, despite its intervening issuance by a neutral magistrate).
 
 
 82
 B. Lack of Excessiveness. The contention that the $500 figure was not excessive is a limp one. It is the law of the case, as the district judge instructed the jury, that:
 
 
 83
 The purpose of bail is to insure the presence of the accused at future proceedings, and the governing criterion to test the excessiveness of bail is not whether the defendant is capable of posting bond, but whether the amount set is reasonably calculated to assure the defendant's appearance.
 
 
 84
 Given this benchmark, the evidence undoubtedly permitted a finding of excessiveness. Wagenmann was a responsible citizen, gainfully employed, without any blackened past record. Passing the fact that the charges placed against him (e.g., paperwork infractions of the motor vehicle code, disturbing the peace) were apocryphal, they were, even at face value, not particularly serious ones. There was no legitimate reason to think that Wagenmann would not keep any scheduled court date. The problem was not that Wagenmann might flee; it was that he would not leave. The jury, having supportably concluded that the police had no colorable basis for detaining the plaintiff, was certainly warranted in finding that bail--in an amount engineered purposefully to guarantee continued confinement--was excessive.
 
 
 85
 The suggestion that Wagenmann's putative possession of some $1,500 at the time of his arrest estops him from challenging excessiveness of bail is equally meritless. "The test for excessiveness [of bail] is not whether defendant is financially capable of posting bond but whether the amount of bail is reasonably calculated to assure the defendant's appearance at trial." United States v. Beaman, 631 F.2d 85, 86 (6th Cir.1980). Even an accused who posts the required bond does not forfeit the right to complain about how or why it was set. See, e.g., Jennings v. Abrams, 565 F.Supp. 137 (S.D.N.Y.1983). "The lack of logic in a contention that simply because bail has been set in an amount within reach of a criminal defendant it is ipso facto not unreasonable is, or should be, ... apparent...." Id. at 138. Moreover, though it is unnecessary to dwell upon the point, $1000 of the plaintiff's funds were never inventoried at the police station. This nest-egg never existed (so say the defendants), or it disappeared in some mysterious, perhaps sinister, fashion during the ransacking of the car (so says the plaintiff). On either hypothesis, the jury could well have concluded that, at the time bail was fixed, Wagenmann had only $480 on hand--and Pozzi, knowing this, manipulated the bail level to a cruelly tantalizing figure just out of appellee's reach.
 
 
 86
 We find no warrant in this record for upsetting the jury's finding against Pozzi in respect to excessive bail. The district court did not err in denying the defendant-appellant's posttrial motions as to liability on this count.
 
 V. EMOTIONAL DISTRESS
 
 87
 The three affected appellants disavow liability for intentional infliction of emotional distress. As a general proposition, Massachusetts recognizes the tort and requires the coincidence of four elements to allow recovery under such a theory:
 
 
 88
 The plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; ... (2) that the conduct was 'extreme and outrageous' ...; (3) that the actions of the defendant were the cause of the plaintiff's distress; ... and (4) that the emotional distress sustained by the plaintiff was 'severe'...."
 
 
 89
 Simon v. Solomon, 385 Mass. 91, 95, 431 N.E.2d 556 (1982) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976)). Proof of the foregoing elements will permit recovery for "purely emotional suffering unaccompanied by physical injury." Simon, 385 Mass. at 95, 431 N.E.2d 556. In recognizing this species of tort, Massachusetts has decreed that "the door to recovery should be opened but narrowly and with due caution." Agis, 371 Mass. at 144, 335 N.E.2d 315 (quoting Barnett v. Collection Serv. Co., 214 Iowa 1303, 1312, 242 N.W. 25 (1932)). Liability must spring from conduct so abhorrent that a civilized community simply cannot tolerate it. Id. 371 Mass. at 145, 335 N.E.2d 315. See generally Brown v. Freedman Baking Co., 810 F.2d 6, 10 (1st Cir.1987); Restatement (Second) of Torts Sec. 46 comment d (1965).
 
 
 90
 The first and last elements of the quadrille are easily satisfied in this instance. If the acts attributed to Pozzi, Campbell, and Anderson by the plaintiff did occur, and if they were wrongful in nature, then certainly the defendants had every reason to know that wrenching psychic harm was a likely result of arresting and imprisoning an innocent man on the eve of his daughter's wedding, and committing him, though sane, to a mental institution. In the same vein, it would be absurd to suggest that the plaintiff, given the horror of his spells in jail and at WSH, did not suffer severely.
 
 
 91
 The appellants seem to concede these points. Nevertheless, they heatedly contest the presence of the second and third elements. They deny that their acts or omissions constituted a substantial cause of Wagenmann's detention and resulting anguish. And, they emphasize that the plaintiff's arrest and commitment were the product of a genuine, good-faith belief on the part of all concerned that he posed a clear and present danger to the safety of others (specifically, the Anderson family). Accordingly, this thesis runs, the behavior which took place was neither reckless nor outrageous.
 
 
 92
 Though made passionately and at considerable length, these arguments are bootless. We know from what has gone before, see supra Part II, that there was ample evidence from which a jury might properly have inferred (i) that a conspiracy to remove Wagenmann from circulation was afoot, and (ii) that the protagonists determined to accomplish this objective at all costs and by the nearest means, in manifest derogation of the appellee's civil rights. So, causation has been adequately documented. It would, therefore, serve no useful purpose to repastinate the arid soil in which these appellants root their claims to good faith.
 
 
 93
 The quality of the conduct, regrettably, speaks for itself. If the proof is scrutinized in the manner most hospitable to Wagenmann (as it must be at this juncture), what occurred was a grotesque journey into some nether region, sufficient to shock the sensibilities of the most battle-hardened stoic. That journey was a plainly foreseeable result of what these defendants set out to accomplish. If donning color of law--using official power--to yank an innocent man off the public street, jail him, and then shunt him to a mental institution is not anathema to the values of our society, then our society has no (worthwhile) values. We have scant difficulty, on the face of things, sustaining the jury's finding that the patently unconstitutional usurpation of Wagenmann's liberty implemented by Pozzi, Campbell, and Anderson was outrageous. And, it was the direct, efficient cause of plaintiff's acute emotional distress.
 
 
 94
 In short, the jurors had before them evidence--which they chose to credit, as was their exclusive prerogative--of each and all of the four factors necessary to comprise the tort. The district court, which saw the witnesses and heard their testimony, discerned no miscarriage of justice in the resultant verdicts on these claims. On this record, we see no material error of law and no abuse of the trial judge's wide discretion. It follows, therefore, that the court's denials of appellants' motions for judgments n.o.v. and for new trials on these claims are unimpugnable.
 
 VI. DAMAGES
 
 95
 We deal next with the damages awarded against Pozzi, Campbell, and Anderson, respectively.[13] The appellants' attack these awards on two fronts. We consider each onslaught separately.
 
 
 96
 A. Excessiveness. The first foray questions the alleged overgenerousness of the awards, averring that the sums recovered were in no way consonant with the evidence. The obstacles which stand in the path of such a remonstrance are formidable ones. Translating legal damage into money damages--especially in cases which involve few significant items of measurable economic loss--is a matter peculiarly within a jury's ken. As this court has often stated, "[w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded." Brown v. Freedman Baking Co., 810 F.2d at 11. On appeal, "a jury's award will be set aside only when it is so excessive 'that the district court's refusal to order a new trial constitutes a manifest abuse of discretion.' " Joia v. Jo-Ja Service Corp., 817 F.2d at 918 (quoting Rivera v. Rederi A/B Nordstjernan, 456 F.2d 970, 975 (1st Cir.), cert. denied, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972)). After viewing the evidence in the light most favorable to the proponent of the verdict, Betancourt v. J.C. Penney Co., 554 F.2d 1206, 1207 (1st Cir.1977), the jury's fashioning of a price tag will not be disturbed "unless it is 'grossly excessive,' 'inordinate,' 'shocking to the conscience of the court,' or 'so high that it would be a denial of justice to permit it to stand.' " Segal v. Gilbert Color Systems, Inc., 746 F.2d 78, 80-81 (1st Cir.1984) (quoting Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 159 & n. 4, 89 S.Ct. 331, 333 & n. 4, 21 L.Ed.2d 309 (1968)). Accord McDonald v. Federal Laboratories, Inc., 724 F.2d 243, 246 (1st Cir.1984); LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico, 536 F.2d 443, 447 (1st Cir.1976).
 
 
 97
 Our focus in this case must, of course, be on the post-remittitur amounts, rather than upon the initial awards (now mooted by the district court's paring of them). See Segal v. Gilbert Color Systems, Inc., 746 F.2d at 81. The district court, it will be recalled, effected substantial reductions, shrinking the aggregate awards from $1,685,000 to $285,000. See supra n. 2. The affected appellants must show, therefore, that the reduced sums remain so exorbitant, so disturbing to our collective conscience, as to entitle them to new trials. They have not managed this feat.
 
 
 98
 Before commenting further, we remark that the fact of the district court's intervention is itself significant. Once a verdict has been trimmed and reshaped at the hands of the trial judge, an assault on the remaining amount calls upon us not merely to grade the essay, but to grade the teacher's grading of the essay. The resultant constraints are not inconsiderable. We agree with the Fifth Circuit that "[w]here the trial court already has invoked its discretion in granting a remittitur, [the] scope of review is even narrower than usual." Stapleton v. Kawasaki Heavy Industries, Ltd., 608 F.2d 571, 574 n. 7 (5th Cir.1979). Accord Princemont Construction Corp. v. Smith, 433 F.2d 1217, 1221 n. 25 (D.C.Cir.1970) (per curiam).
 
 
 99
 The jury heard plethoric evidence about the trauma Wagenmann suffered (and continues to suffer) in consequence of his improvident arrest, unjust incarceration, and involuntary commitment to a mental hospital.[14] The record is replete with items reflecting the stress, fear, humiliation, embarrassment, anguish, and stigmatization which he underwent during this nightmarish episode. The trial judge, who observed the witnesses and was in the best possible position to assess their credibility and to absorb the subtle (and not-so-subtle) nuances of the testimony, commented that "[p]laintiff undoubtedly experienced a horrific thirty-six hours ... under what could be described as Kafkaesque procedures." Once the plaintiff's version of the events antecedent to his arrest and confinement is accepted--and the jury was well within its rightful province to endorse that version--it is but a short (and plainly indicated) step to the district court's description of the ensuing experience as "horrific."
 
 
 100
 Admittedly, the awards which eventuated were outsized. But the district court, from its observation post on the front lines, found specifically that "the jury's responses to the special verdict questions clearly demonstrate[d] a careful and discriminating consideration of the evidence against each of the defendants on all of the claims." The court proceeded, as duty dictated, to pare the awards where and as indicated, to bring the amount of damages on each questioned claim and as to each questioning defendant within the proper realm. Granted that such work is by its very nature inexact--there is no scientific formula or measuring device which can be applied to place a precise dollar value on matters such as restraint of freedom, fright, anxiety, loss of face, or emotional scarring--the district court made a thoughtful, evenhanded effort to roll back verdicts it thought too high to the outer limits of reasonableness. Bearing in mind that the extent of a damage award for noneconomic injuries attributable to the abridgment of one's constitutional rights is a matter committed largely to the discretion of the trial court, we are disinclined to intervene in a situation where, as here, the methodology of the district judge's review cannot seriously be faulted and the ensuing product fits within the wide range of arguable appropriateness.
 
 
 101
 Over and above the compensatory damages awarded, punitive sums were also assessed. It is beyond debate that "[p]unitive damages are an appropriate means of punishing [civil rights violations] and deterring defendants from future [such conduct]." Brown v. Freedman Baking Co., 810 F.2d at 11. As with other damages, the amount of such an award is, in the first instance, committed to the discretion of the nisi prius court. As we have already noted, the dimensions of appellate review of damage awards--be they compensatory or punitive--are quite small; and they become tinier still where, as in Anderson's case, a substantial chunk of an award was remitted below. See Stapleton, supra; Princemont Construction Corp., supra.
 
 
 102
 In this instance, given the shocking nature of the behavior involved, punitive damages were an apt means of chastising these offenders and deterring others. The amounts of the punitive awards which confront us--$25,000 apiece as to Anderson and Pozzi, $10,000 as to Campbell--can best be characterized as modest, the premises considered. Our appraisal of the record convinces us that, as to these three appellants, the post-remittitur damages, compensatory and exemplary alike, fall "well 'within the universe of possible awards that are supported by the evidence....," Segal v. Gilbert Color Systems, Inc., 746 F.2d at 81 (quoting Clark v. Taylor, 710 F.2d 4, 14 (1st Cir.1983)).
 
 
 103
 B. Passion and Prejudice. The defendants' second front requires us to focus more on the original verdicts than on the remittiturs. We must consider the possibility that the jury's original overestimation of the damages indicated a passion or prejudice so virulent as to nullify the verdicts entirely. See 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2815 (1973). We do not believe this to be so. In addressing the point, we take the view that there is no reliable mathematical formula which can spare a reviewing tribunal effort in the face of this sort of challenge. Regardless of the multiples involved--the number of times by which the dollar value of an awarded verdict exceeds what a trial or appellate court believes to be the periphery of reasonableness--each case is unique. Thus, though we are troubled that the jury awarded Wagenmann compensatory damages which were, on average, some seven times more than the district court permitted him to retain, see supra Part I & n. 2, we regard that imbalance as important--but not dispositive.
 
 
 104
 In denying the motions for new trials, the district court opined that, while the damages awarded were sufficiently overgenerous as to warrant sharp reduction, the verdicts were not "the result of passion and prejudice which would make remittitur improper." The district court also considered, and rejected, the possibility of a new trial limited to damages alone, citing the impossibility of separating the issues anent damages from those anent liability without creating such confusion and uncertainty as would amount to abandonment of a fair trial. This was plainly a proper consideration. See Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); Payton v. Abbott Labs, 780 F.2d 147, 154 (1st Cir.1985). And ultimately, the court saw no reason why the prudent use of the power to condition a new trial order on a series of remittiturs would not effectively cure any harm arising out of overages in the verdicts. These determinations are, of course, subject to review only for abuse of discretion.
 
 
 105
 We have examined the district court's characterization of the jury verdicts, and have in turn assayed an independent "appraisal of the evidence bearing on damages." Grunenthal v. Long Island R.R. Co., 393 U.S. at 159, 89 S.Ct. at 333. We do not find, as a matter of law or logic, that a plenary new trial--or even a new trial limited to the damage issues--was essential to do justice between these parties. The evidence favoring the plaintiff on liability was fairly strong. There is no reason to believe that the jury disregarded the instructions of the district court--the judge was obviously satisfied that no such deviation occurred--or that its verdict was infected by some misapprehension as to the law. Leaving aside the excess award, the fundamental fairness of the proceedings remains completely unscathed. And, the caselaw indicates that where the size of a verdict comprises the only perceptible infirmity in it, the jury's liability findings are not automatically to be set aside. See Krall v. Crouch Bros., Inc., 473 F.2d 717, 718-19 (8th Cir.1973); Dorin v. Equitable Life Assurance Society, 382 F.2d 73, 77-78 (7th Cir.1967); Curtis Publishing Co. v. Butts, 351 F.2d 702, 717-18 (5th Cir.1965), aff'd, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
 
 
 106
 To be sure, this was a case in which passions could run high. The conduct of the defendants, on plaintiff's view of the matter, was nothing short of despicable. And the jury plainly saw the affair in that light. Yet a trial is not an exercise in computer science. It recreates for the factfinder the reality of flesh-and-blood events. Our judicial system is not so impractical as to demand that the last drop of juice be squeezed from evidence before a jury can consider it. A controlled environment for the reception of proof is essential, but an artificially sterile environment is neither necessary nor desirable. Jurors are not expected to act as automatons, stripped of all feelings. Rather, the passion and prejudice against which the law guards are undue passion and unfair prejudice--passion and prejudice of the sort which cloud impartial scrutiny and reasoned evaluation of the facts, which inhibit neutral application of principles of law to the facts as found. Cf. Onujiogu v. United States, 817 F.2d 3, 6 (1st Cir.1987) (all evidence is meant to be prejudicial; only "unfair" prejudice is to be avoided). Evidentiary fires which, in burning brightly, inflame instead of illuminating, must be banked. Others, despite being emotionally charged, are entirely permissible, so long as probative value can be expected to outweigh untoward effects.
 
 
 107
 After reviewing the record in meticulous detail, we are not persuaded that passion overcame perception in the jury room. Though the question is not entirely free from doubt, we cannot say that the district court erred in determining that the liability verdicts were untainted. Accordingly, we defer to that court's choice as among the available alternatives and rule that its discretion was not misused in declining to grant outright new trials. The court acted within its rightful domain in requiring the plaintiff to remit excessive damages and, conditional upon these remittiturs, denying the motions of Pozzi, Campbell, and Anderson for new trials.
 
 VII. MALPRACTICE
 
 108
 We turn now to the appeal of Edward Healy, the plaintiff's erstwhile counsel. Healy contends, inter alia, that the district court erred in denying his motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial. He makes several interesting arguments. He urges that, in the absence of expert testimony on the standard of care, the evidence was insufficient to warrant a finding that he failed to exercise a reasonable degree of lawyerly skill. Next, Healy cites what he sees as a paucity of evidence to prove that, but for his negligence, Wagenmann would not have been committed (or would have been released sooner). Third, the appellant questions the plaintiff's right to recover damages for noneconomic loss in this legal malpractice case. We address this trio of claims seriatim.[15]
 
 
 109
 A. Need for Expert Testimony. In Massachusetts, an attorney owes his or her client a duty to exercise the degree of care and skill of the average qualified practitioner. Fishman v. Brooks, 396 Mass. 643, 646, 487 N.E.2d 1377 (1986); Pongonis v. Saab, 396 Mass. 1005, ----, 486 N.E.2d 28, 29 (1985); Glidden v. Terranova, 12 Mass.App.Ct. 597, 598, 427 N.E.2d 1169 (1981). In an action for legal malpractice, expert testimony is generally needed to establish both the level of care owed by the attorney under the particular circumstances and the alleged failure to conform to that benchmark. Pongonis v. Saab, 486 N.E.2d at 29; Glidden v. Terranova, 12 Mass.App.Ct. at 598, 427 N.E.2d 1169. Nevertheless, the commonwealth's courts have recognized an exception to the expert testimony requirement "where the claimed legal malpractice is so gross or obvious that laymen can rely on their common knowledge or experience to recognize or infer negligence from the facts." Id. See Pongonis v. Saab, 486 N.E.2d at 29 (similar). See generally Barry, Legal Malpractice in Massachusetts, 63 Mass.L.Rev. 15, 17 (1978).
 
 
 110
 It is instructive to rehearse the type of situation in which a finding of legal malpractice without the benefit of expert testimony has been upheld. Glidden v. Terranova, supra, is such a case. There, the attorney, after being hired with respect to a suit in which his clients were named as defendants, assured them that he had removed the action to the state superior court. The lawyer indicated that everything was well in hand; he had the ball and would run with it. Relying on these comforting words, the clients did nothing further. In fact, the attorney--assurances notwithstanding--had not effected the removal and had permitted default judgments to be entered. Thereafter, the lawyer failed to appear at two hearings--one of which was a scheduled contempt hearing that resulted in the arrest and imprisonment of one of the clients (Glidden). When the remaining clients, dumbfounded by the course of events, sought out the attorney, they were told he was in conference and could not be disturbed. His only response to the clients' desperate pleas for help was a call from his secretary suggesting that they raise bail and seek other counsel. On the presentation of evidence suggesting facts such as these, the Supreme Judicial Court saw no need for expert testimony in order to establish what was obvious to all--that the lawyer had been woefully negligent. Id. at 600.
 
 
 111
 Massachusetts does not stand alone in this wise. Courts in other jurisdictions have also dispensed with any expert testimony requirement in egregious cases, especially those in which an attorney fails to act once he has undertaken to represent a client. E.g., Suritz v. Kelner, 155 So.2d 831, 834 (Fla.Dist.Ct.App.1963) (per curiam) (failure to advise client of need to answer interrogatories), cert. denied, 165 So.2d 178 (Fla.1964); Sorenson v. Fio Rito, 90 Ill.App.3d 368, 45 Ill.Dec. 714, 720, 413 N.E.2d 47, 53 (1980) (failure to take any action whatsoever with regard to estate matters); House v. Maddox, 46 Ill.App.3d 68, 4 Ill.Dec. 644, 360 N.E.2d 580, 584 (1977) (allowing statute of limitations to run and otherwise neglecting to protect client's interests); George v. Caton, 93 N.M. 370, 600 P.2d 822, 829 (1979) (failure to sue before expiration of limitations period), cert. quashed, 93 N.M. 172, 598 P.2d 215 (1979); Olfe v. Gordon, 93 Wis.2d 173, 286 N.W.2d 573, 578 (1980) (failure to abide by client's specific instructions); cf. Hill v. OKay Construction Co., 312 Minn. 324, 252 N.W.2d 107, 116-17 (Minn.1977) (no expert testimony required when conflict of interest "obvious").
 
 
 112
 When the events of this litigation are displayed against the backdrop of the foregoing cases, it is clear that, because Healy committed malpractice "so gross or obvious" that expert testimony was not required to prove it, this assignment of error must come to naught. Once Healy undertook to represent Wagenmann, he seems to have done almost nothing to protect his client--either before or after commitment. Virtually from the start, the lawyer paid no heed to the warning signs. He appears to have ignored not only the client's wishes, but the client's protestations of innocence and mental stability. The attorney gave short (if any) shrift to Dr. Myerson's misgivings. Despite Wagenmann's repeated requests to be brought before a judge, Healy did not seek to arrange a hearing. The barrister's lame excuse for not doing so--his self-serving depiction of Wagenmann as uncooperative and as a man who would have "hung himself"--varies markedly from Dr. Myerson's reaction. In light of the verdicts, it is clear that the jury disbelieved Healy's account. We think the record affords a sufficient basis for such a conclusion. We cite but a few examples.
 
 
 113
 One striking illustration of what the jurors could well have found to be dereliction of duty centered around the psychiatric outlook. Although Healy was aware that Dr. Myerson was in the courthouse and available, he never sought to question him either about the case or about his impressions of the plaintiff. Notwithstanding that he knew of the psychiatrist's generally favorable evaluation, Healy did not deem it important to determine in detail Dr. Myerson's complete opinion or the full extent of his findings. Healy's seeming indifference to Wagenmann's mental state--and to his plight, generally--was little short of appalling.
 
 
 114
 Another example of the shoddy representation which Wagenmann received involved counsel's failure to interview--or attempt to interview--any of the prosecution witnesses. The lawyer did not try to speak with either Stephen or Linda, two key figures in the psychodrama (both of whom were present in the courthouse). Instead, Healy claims he relied on the police as his sole source of information about the affair. Passing the fact that this amounted to asking the fox if the chickens were secure, Healy did precious little on that front. He was unable to identify from the witness stand even one police officer with whom he had spoken on the infamous day of arraignment and commitment.[16]
 
 
 115
 The final example--the straw, perhaps, that broke the dromedary's back--relates to Healy's dealmaking. Rather than requesting a formal hearing before Judge Luby, or consulting appropriately with Wagenmann, or making out a psychiatric case for competency, or interviewing witnesses, the lawyer-appellant avers that he attempted to procure his client's release by striking a bargain with the police. But Pozzi and Brabbs testified they had no conversations with the lawyer, see supra n. 16, and Healy failed to produce or to name any police witnesses with whom he attempted to arrange the alleged deal.
 
 
 116
 Moreover, to the extent there was a possible deal at all, its existence could not excuse the attorney's inattention in other areas. Even Healy concedes that Wagenmann made it clear, early on, that he was not interested in any leave-town-quick proposition. Nor did Healy take any constructive action in the wake of Wagenmann's commitment. He filed no pleadings on behalf of his client. He did nothing anent bail. He neglected even to review the commitment order which had been entered. What is more, there was obviously much which could have been done: after all, a nonlawyer (Dr. Myerson), incensed by what had occurred, was able to effect the plaintiff's release the next day by making a single telephone call to the chief judge of the state district court.
 
 
 117
 Before leaving this subject, we make brief reference to the authorities upon which the appellant relies. Those cases, without exception, are either distinguishable or inapposite. We will not discuss them all, but offer a representative sampling. In Prawer v. Esseling, 282 N.W.2d 493 (Minn.1979), the undisputed testimony of ten professionals (eight doctors and two psychologists) established that the plaintiff required hospitalization and treatment. In the absence of contradictory medical opinion, his internment was unquestionably proper and not the result of malpractice. Id. at 494. Prawer is thus at a far remove from the case at bar. Woodruff v. Tomlin, 616 F.2d 924 (6th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980), stands for a somewhat different proposition: that within wide limits, an attorney's choice of trial tactics does not subject him or her to malpractice liability. We agree. Healy's case, however, is well beyond the pale. He appears, on this record, less to have chosen between professionally acceptable alternative approaches than to have blithely disregarded his client's interests. We note, too, that Woodruff also supports the principle that failures to act and to follow up leads cannot automatically be swept under the rug by labelling them "trial tactics." 616 F.2d at 934. The other cases which Healy spotlights suffer from similar infirmities.
 
 
 118
 Sometimes an attorney is so grossly ineffective that his lack of professionalism is plain to see. Even the untutored eye can discern blundering of an egregious and uncomplicated sort. For such instances, Massachusetts has recognized a narrow "gross or obvious" malpractice classification in which no expert testimony is needed. This case fits neatly within the contours of that category. Assessing the totality of the evidence both up to the time of commitment and thereafter, we conclude that the record, viewed favorably to the plaintiff, demonstrated a lack of care, skill, and diligence on counsel's part "so gross or obvious" that the jury could reasonably appreciate, without the aid of expert testimony, that malpractice had occurred.
 
 
 119
 B. Causation. Healy insists that Wagenmann failed to prove he would not have been committed (or would have been released sooner) but for lawyerly negligence. We begin our analysis of this point by acknowledging that the district court, in its instructions to the jury, indubitably placed the burden on the plaintiff to show that Healy's malpractice was a material element and substantial factor in causing Wagenmann's commitment. The court further charged that if Wagenmann would have been committed no matter what action the lawyer took or neglected to take, then in such event, Healy would not be liable.[17] Assaying the evidence as we must, in the light most flattering to the appellee, we conclude that it was sufficient for a rational factfinder to determine that Wagenmann, more likely than not, would have escaped commitment had he been represented with due skill and diligence.
 
 
 120
 On this issue, the testimony of Dr. Myerson,[18] whose views were not properly voiced due to counsel's boycotting of the physician, was a potent weapon. Furthermore, there was evidence that several other examining psychiatrists apparently agreed in substance with Dr. Myerson's evaluation. On this item alone, the jury could rationally have deduced that, had Healy done his job and brought Dr. Myerson to the forefront, it was unlikely that commitment would have ensued. The jury could likewise have concluded that, had Healy heeded his client's repeated demands for a hearing, Wagenmann's competency would have been as obvious to the magistrate as it was to Dr. Myerson. Finally, the plaintiff's speedy release the next day, facilitated by a paladin with no formal legal training, bore witness to the likelihood that, had the lawyer performed professionally, Wagenmann would have been spared his ordeal at WSH. The district court was of a mind that "the jury was justified in concluding that had Mr. Healy represented his client's case more zealously, Judge Luby might not have committed the plaintiff to the mental hospital." This, we think, understates the matter. The record fully supported a jury finding that, but for the want of reasonably professional representation, Wagenmann would not have been confined to a mental institution.
 
 
 121
 C. Damages. The lawyer-appellant's attack on damages is based upon the premise that his former client, if entitled to recover at all, was not entitled to receive what Healy characterizes as damages for emotional distress. In the attorney's view, any recovery inuring to the plaintiff's benefit in this legal malpractice case must perforce be limited to economic losses (minimal in this instance). We cannot subscribe to this viewpoint.
 
 
 122
 As a direct and proximate result of Healy's ineffectiveness, the plaintiff was forcibly deprived of his liberty and dispatched to a mental hospital. The fright and suffering incident to such a wrenching dislocation can hardly be overstated. Subsequent to his release, Wagenmann claimed (credibly) to have undergone continuing anguish and to have felt the weight of the stigma attendant to such confinement. He feared that others would learn of it and question his sanity. The district judge instructed the jurors that if they found liability on this count, they could award reasonable damages to compensate for "any pain, suffering, humiliation and mental anguish" suffered and to be suffered by the plaintiff, caused by Healy's (mis)conduct. We decline the appellant's invitation to relieve him of the foreseeable consequences of his malpractice by the overly simplistic expedient of relabelling the resultant award as damages for "emotional distress."
 
 
 123
 The thrust of Healy's argument is that Massachusetts law limits recovery for emotionally-based injuries in narrowly constrained ways. We agree, to some extent. But, that generality does not capture the flag. The cases which this appellant cites in an effort to blanket this verdict with his reasoning are inapposite. Cf., e.g., Aumiller v. University of Delaware, 434 F.Supp. 1273, 1310 (D.Del.1977) (proof of all elements of tort of intentional infliction of emotional distress not necessary to recover compensatory damages for psychic injury in Sec. 1983 action).[19] We offer no opinion on the appropriateness of denying recovery of "emotional distress" damages in cases where the claimed malpractice involves merely property rights. See, e.g., Carroll v. Rountree, 34 N.C.App. 167, 237 S.E.2d 566 (1977); Quezada v. Hart, 67 Cal.App.3d 754, 136 Cal.Rptr. 815 (1977). The situation is completely different where, as here, the lawyer's malpractice results in a loss of liberty.
 
 
 124
 In Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Court limned the significance of the personal loss incident to involuntary commitment:
 
 
 125
 [C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.... Moreover, it is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomen[on] "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.
 
 
 126
 Id. at 425-26, 99 S.Ct. at 1809 (citations omitted).
 
 
 127
 This statement of the stark reality of civil commitment must, in the context of this case, be synchronized with what the Massachusetts Supreme Judicial Court has recently written on the subject of legal malpractice. In Fishman v. Brooks, 396 Mass. at 646, 487 N.E.2d 1377, the court noted that "[a]n attorney who [commits malpractice] is liable to his client for any reasonably foreseeable loss caused by his negligence." Applying Addington and Fishman in concert, there is little room to doubt that the harm Wagenmann suffered due to Healy's bungling was real and significant, and that the injury was reasonably foreseeable under the circumstances. Any attorney in Healy's position should readily have anticipated the agonies attendant upon involuntary (and inappropriate) commitment to WSH and the subsequent stigma and fear associated with such a traumatic episode. The damages were therefore recoverable under Massachusetts law.
 
 
 128
 Were we to accept the notion that a client's recovery on the grim facts of a case such as this must be limited to purely economic loss, we would be doubly wrong. The negligent lawyer would receive the benefit of an enormous windfall, and the victimized client would be left without fair recourse in the face of ghastly wrongdoing. Despite having caused his client a substantial loss of liberty and exposed him to a consequent parade of horribles, counsel would effectively be immunized from liability because of the fortuity of the marketplace. That Healy was guilty of malpractice in the defense of commitment proceedings, rather than in the prosecution of a civil claim for damages, is no reason artificially to shield him from the condign consequences of his carelessness. We are not required by the law of the commonwealth, as we read it, to reach such an unjust result.
 
 
 129
 We conclude that Wagenmann was entitled to recover the full measure of his damages attributable to Healy's malpractice. That being so, the recompense at issue, i.e., the post-remittitur sum of $50,000, was well within the sphere of acceptable awards. The indignities to which the plaintiff was subjected through the callous neglect of one appointed to champion his cause translate into a substantial monetary entitlement. Given what the client was made unwarrantedly to endure, and the district court's trimming of the jury's large award, the court's denial of any further relief to the lawyer-appellant was appropriate.[20]
 
 VIII. ATTORNEYS' FEES
 
 130
 Appellants Pozzi, Campbell, and Anderson contest the district court's award of attorneys' fees, both in principle and in amount.[21] First, they argue that the Fees Act of 1976, 42 U.S.C. Sec. 1988, does not apply in this case because the incidents giving rise to the litigation occurred some two months before the effective date of the Act (October 19, 1976). Alternatively, they maintain that the award is in any event bloated. The district court, appellants huff, has rewarded plaintiff's counsel for overstaffing, duplicative effort, and unnecessary hours. Neither assertion passes muster.
 
 
 131
 A. Applicability of the Fees Act. The suggestion that Sec. 1988 does not extend to this case can best be described as a canard. The legislative history of the statute makes plain that Sec. 1988 is "intended to apply to all cases pending on the date of enactment as well as all future cases." H.R.Rep. No. 94-1558, 94th Cong., 2d Sess. 4 n. 6 (1976), quoted in David v. Travisono, 621 F.2d 464, 466 (1st Cir.1980) (per curiam). When the law took effect, the instant action was not "pending" in the sense that, though the predicate acts had taken place, suit had not yet been filed. Nevertheless, if not regarded as "pending," then the action must necessarily qualify as a "future case" within the contemplation of the statute--i.e., one filed after the statute's effective date. Such a commonsense inference is nourished by the fact that Congress extended Sec. 1988's coverage to "all " future "cases," rather than merely those whose predicate causes of action arose after its effective date. And, since the Fees Act likewise applied to all cases pending at the time of enactment, Congress was obviously not averse to applying Sec. 1988 to cases whose underlying rights of action arose prior to the law's effective date, but which had not yet been litigated to final judgment. Where doubt has arisen--and it is difficult for us to see any--we are obliged, within the constraints of language, to interpret and apply the statute consistent with the discernible legislative intent. Philbrook v. Glodgett, 421 U.S. 707, 713-14, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); United States v. American Trucking Associations, Inc., 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); Sierra Club v. Secretary of the Army, 820 F.2d 513, 522 (1st Cir.1987).
 
 
 132
 Then, too, we must take into account the awkward scenario which the appellants' rendition of the law would construct. Were we to adopt their view, the Fees Act would cover ancient history--so long as a suit had been brought before October 19, 1976. Yet, it would not apply to more recent events if process had not been issued by that date. If prior to the effective date twin plaintiffs, under identical circumstances, were injured on the same day by the same unconstitutional "state action," yet sued forty-eight hours apart--one on October 18th and the other on October 20th--the former would be entitled to recover fees if he prevailed, the latter would not. Such a paradoxical interpretation makes precious little sense. It is not surprising, therefore, that the defendants have been unable to develop any rationale to explain why Congress would have wanted to create such a lacuna in the statute. Because "we honor the rule that a statute should be construed so as to avoid unjust or absurd results," Sierra Club, 820 F.2d at 523, we decline to bend the plain meaning of Sec. 1988 to suit the appellants' wishes.
 
 
 133
 It is well settled that under fee-shifting statutes, "a court is to apply the law in effect at the time it renders its decision...." Bradley v. School Board of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).[22] Mindful of the legislative goals which undergird the Fees Act and the absence of the slightest indication that Congress intended to capture claimants such as Wagenmann in an illogical time warp, we find no basis for restricting the reach of 42 U.S.C. Sec. 1988, as it pertains to cases not pending on its effective date, to those which accrued subsequent thereto. Wagenmann, as a prevailing party against three appellants chargeable as state actors, was entitled to recover his reasonable counsel fees and costs. 42 U.S.C. Sec. 1988.
 
 
 134
 B. Amount of the Award. This takes us to the appellants' contention that the fee award was excessive. We have stated, more times than we care to remember, that the determination of what constitutes a "reasonable" attorney's fee under Sec. 1988 rests within the sound discretion of the district court. E.g., Jacobs v. Mancuso, 825 F.2d 559, 561 (1st Cir.1987); Aubin v. Fudala, 821 F.2d 45, 47 (1st Cir.1987); Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir.1984); Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir.1980); Lund v. Affleck, 587 F.2d 75, 78 (1st Cir.1978). We will not lightly disturb the exercise of that discretion. See Rogers v. Okin, 821 F.2d 22, 30 (1st Cir.1987) ("To a far greater extent than is true of discrete legal issues, the battle [over fee awards] is likely to be determined in the trial court."). In the case at bar, there is absolutely nothing to suggest that the district court let its discretion run amok in the ascertainment of reasonable fees. To the exact contrary, the district court's painstaking analysis of the fee application stands out as a model of thoroughness and care.
 
 
 135
 In its memorandum and order, the district court reviewed the application, dealt squarely and convincingly with the assertion that overstaffing and undue hours had produced an excessive request, and properly applied the methodology we prescribed in Grendel's Den, Inc. v. Larkin, 749 F.2d at 950, to "first determine the number of hours actually spent and then subtract from that figure hours which were duplicative, unproductive, excessive or otherwise unnecessary." After noting that there was no dispute as to the number of hours actually expended on Wagenmann's behalf, the court found that:
 
 
 136
 plaintiff's attorneys have been scrupulous in avoiding duplicative efforts where ever possible. Where some duplication did occur, such as when a new attorney began working on this case, or where time was devoted to unsubstantial claims, plaintiff's counsel have taken a voluntary reduction.
 
 
 137
 The record satisfactorily reflects fulfillment of the directive that "[c]ounsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary...." Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). In point of fact, Wagenmann's attorneys voluntarily trimmed some 253.6 hours from the fee application--a reduction equivalent to over $20,000 in claimed fees. In addition, the district court, as a result of its independent inquiry, shrunk the requested stipend further--and this, notwithstanding the court's overall conclusion that, by and large, the lawyers had not "overstepped the boundary between vigorous and complete representation into excess."
 
 
 138
 Where fee-shifting statutes such as Sec. 1988 are called into play, we must hesitate to nitpick what are essentially factual matters. The district court--which in the ordinary course of events has far greater familiarity than do we with how much was done, who did it, and how effectively the result was accomplished--must be ceded rather broad authority in these matters. See Aubin v. Fudala, at 47. Where, as here, it is clear that the trial judge applied the appropriate standards, that the end product falls within the broad spectrum of permissible awards and rates, and that counsel exercised sensible "billing judgment," see Riverside v. Rivera, 477 U.S. 561, 106 S.Ct. 2686, 2692 n. 4, 91 L.Ed.2d 466 (1986); Hensley v. Eckerhart, 461 U.S. at 437, 103 S.Ct. at 1941, there is no reason for an appellate court to interfere. Save for one small instance (discussed infra ), the district court did not abuse its discretion in the calculation of fees and costs.
 
 
 139
 C. Interrelation of Claims. The last of the fee-based lamentations stems from Anderson's claim that he should not be held responsible for services rendered in connection with the legal malpractice claim against Healy. Yet, as the Supreme Court has noted:
 
 
 140
 In [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
 
 
 141
 Hensley, 461 U.S. at 435, 103 S.Ct. at 1940.
 
 
 142
 Citing this language, the court below found that the malpractice action was so factually imbricated with the federal civil rights claims as to make separate treatment of the constituent attorney time inappropriate. There is ample record support for this conclusion. All of the triable issues arose out of a short, visibly linked series of events into which Wagenmann was involuntarily plunged in mid-August of 1976. The facts and their relationship as set forth above, see supra Part II, provide solid basis for a finding that the state law initiatives (including the malpractice claim against Healy) were sufficiently interconnected with the Sec. 1983 claims as to warrant an award of fees for time spent on all aspects. The district judge, who had a front-row seat at the trial and before, found the necessary linkage to exist. That being so, there is sound reason for us to defer unhesitatingly to the district court's conclusion in this regard. See Aubin v. Fudala, at 46-47.
 
 
 143
 D. Certain Disbursements. There remains, however, the matter of three disbursements, totalling $1390, made to Paul Garrity, a former state court jurist, as a "consultant." Garrity's testimony was blocked because of a failure to disclose his identity sufficiently in advance of trial. Had he been permitted to take the stand, the witness would have given expert testimony on the attorney-client standard of care. The payments made to him were taxed against Pozzi, Campbell, and Anderson as part of the recoverable expenses under Sec. 1988, notwithstanding the fact that they bore exclusively on the malpractice action against Healy.
 
 
 144
 Though we have found the malpractice claim and the Sec. 1983 claims interrelated for the purpose of fees--after all, here, as in Aubin v. Fudala, supra, "[i]t might not have been practical for the lawyers to allocate each hour among the several factually related legal claims," id., at 47--that does not mean that a clearly segregable expense item, which has no conceivable relevance to the civil rights aspect of the litigation, should be allowed to stand. Whether or not Wagenmann can tax any portion of Garrity's fees as costs against Healy under Fed.R.Civ.P. 54(d) and 28 U.S.C. Sec. 1821--a question which is not before us, and as to which we offer no opinion--it is plain that the plaintiff cannot make an end run around the modest ceiling set by those provisions, see Crawford Fitting Co. v. J.T. Gibbons, Inc., --- U.S. ----, ----, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987), and recoup the higher amount actually charged by the prospective witness from parties totally unconcerned with, and unaffected by, the proposed testimony.
 
 
 145
 We therefore order the district court, on remand, to delete the sum of $1390 from the cost portion of the Sec. 1988 award. In all other respects, however, the assessments made by the district court under the Fees Act must stand.
 
 IX. CONCLUSION
 
 146
 In fine, we believe that the jury's view of Wagenmann as "a man more sinn'd against than sinning,"[23] to borrow a phrase which the bard of Avon used to describe another daughter-doubting paterfamilias, is fully supportable on this record. In consequence, we are constrained to hold the evidence adequate to sustain the jury verdicts as to the defendants' liability. In reaching this conclusion, we have examined not only the matters discussed herein, but also the remaining contentions of the four appellants. We eschew expository comment on them because some--e.g., the absolute immunity point which the officer-appellants surface for the first time on this appeal--were not raised below, and need not be considered now, see Clauson v. Smith, 823 F.2d 660, 665-66 (1st Cir.1987) (collecting representative cases), and the others are patently meritless. We simply reject all of these further points out of hand.
 
 
 147
 The district court did not err in submitting either the Sec. 1983 claims or the state law claims for jury consideration. It follows, then, that the court below properly denied the appellants' various motions for judgments non obstante veredicto. In like manner, we find that the damages at issue--the jury awards, as pared by the district court, see supra n. 2--are not excessive, unfounded, or otherwise subject to effective attack on appeal. From our vantage point, the evidence cannot be said to preponderate heavily against any of the verdicts or awards, as they now stand. And, perceiving no abuse of discretion or miscarriage of justice, we are prompted neither to overturn the verdicts nor to to fault the trial judge's denial of the sundry motions for new trial.
 
 
 148
 Inasmuch as we have upheld the plaintiff's verdict on the legal malpractice claim against Healy, see supra Part VII, the plaintiff's protective cross-appeal challenging the district court's exclusion of Garrity's proffered expert testimony has become moot. Therefore, we need not treat with it.[24]
 
 
 149
 The awards of counsel fees and costs against appellants Pozzi, Campbell, and Anderson are, with a single minor exception--the so-called "Garrity disbursements" totalling $1390, see supra Part VIII(D)--thoroughly in order. Section 1988 applies, notwithstanding that this slice of life preceded by some two months the passage of the Fees Act. The district court supportably found an interconnection among the various counts which were pleaded and tried, and did not misuse its discretion in computing attorneys' fees.
 
 
 150
 If at all possible, we are determined--in this and other kindred cases--to sidestep the dismaying prospect of the counsel fee tail continuing endlessly to wag the merits' dog. As the Court has taught, "[a] request for attorney's fees should not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. at 437, 103 S.Ct. at 1941. To avoid further complications, we rule here and now that Wagenmann is entitled to reasonable counsel fees and costs incurred in managing what must realistically be regarded as a successful opposition to these several appeals. Thus, we remand to the district court to calculate the amount of additional fees due under Sec. 1988. Accord Aubin v. Fudala, at 47; Lund v. Affleck, 587 F.2d at 77. Such an award can, of course, only be made as to Pozzi, Campbell, and Anderson (where Sec. 1988 has application). To the extent that the time and expenses referable to the proceedings involving the plaintiff and Healy alone (i.e., Nos. 86-1476, 86-1478) are segregable--and we express no opinion on the point--they should comprise no part of this further award. Unlike trial court proceedings, where apportionment of time and charges is often impractical because of interconnectedness, such allocation should ordinarily prove more feasible in an appellate milieu.[25]
 
 
 151
 The judgments in Nos. 86-1475, 86-1476, and 86-1477 are affirmed, and the cases are remanded to the district court for further action with respect to attorneys' fees and costs consistent herewith.
 
 
 152
 Appeal No. 86-1478 is dismissed as moot.
 
 
 153
 Costs in favor of Wagenmann.
 
 
 
 [1]
 Pozzi was found liable on all of these claims except legal malpractice. Campbell and Anderson were found liable for false arrest under Sec. 1983, and on the pendent false imprisonment and emotional distress initiatives. Healy was found liable of the only charge levied against him: legal malpractice. It should be noted that although Pozzi was adjudged liable on the unlawful commitment count, the jury awarded no damages therefor. Accordingly, this count is not implicated in the present appeals
 
 
 [2]
 The plaintiff consented to the reductions. The downscaling left the damages in the following residual posture:
 I. Federal Civil Rights Claims
 A. False Arrest (Pozzi, Campbell, $50,000 *
 Anderson)
 B. Excessive Bail (Pozzi) $25,000
 II. State Tort Claims
 A. False Imprisonment (Pozzi, $50,000 *
 Campbell, Anderson)
 B. Intentional Infliction of $50,000 *
 Emotional Distress (Pozzi,
 Campbell, Anderson)
 C. Legal Malpractice (Healy) $50,000
 III. Punitive Damages
 A. Pozzi $25,000
 B. Campbell $10,000
 C. Anderson $25,000
 
 
 *
 (Asterick indicates joint and several liability.)
 
 
 [3]
 Despite this cross-appeal, we shall for ease in reference continue to refer from time to time to Wagenmann as the "appellee" and to Healy as an "appellant."
 
 
 [4]
 According to Linda and Yvonne, Wagenmann had a history of violent antagonism which he vented against the Andersons and against his daughter for her association with them. The plaintiff, while conceding that he disapproved of Linda's relationship with Stephen for a time, denied ever engaging in the sort of sociopathic behavior attributed to him. We cite this contradictory testimony only to provide necessary context to the events which transpired upon Wagenmann's arrival in Massachusetts
 
 
 [5]
 Debbie did say that Wagenmann vowed "there [would] be no wedding," but she could not recall him voicing threats of violence. Her testimony was such as to support--albeit not to require--a fair implication that Anderson, in recounting at trial what she allegedly told him, was painting the lily
 
 
 [6]
 According to Yvonne, Wagenmann neglected to take the vehicle's registration with him, as the certificate remained in her possession. At the time of his arrest and throughout the ensuing trial, however, her husband maintained that she was mistaken; the registration certificate was inside the glove compartment
 
 
 [7]
 The following exchange between plaintiff's trial counsel and Pozzi is illustrative of the point:
 Q: The allegations about a license, a registration, and disturbing the peace were merely afterthoughts; you arrested him for threats, didn't you?
 A: Basically, yes, sir.
 
 
 [8]
 Prior to its amendment in 1985, the statute provided in relevant part that:
 The motor vehicle of a non-resident may be operated on the ways of the commonwealth ... by any non-resident operator without a license from the registrar if the non-resident operator is duly licensed under the laws of the state or country where such vehicle is registered and has such license on his person or in the vehicle in some easily accessible place ... [A] non-resident who holds a license under the laws of the state or country in which he resides may operate any private passenger motor vehicle of a type which he is licensed to operate under said license, duly registered in this commonwealth or in any state or country, ... provided, that he has the license on his person or in the vehicle in some easily accessible place, and that, as finally determined by the registrar, his state or country grants substantially similar privileges to residents of this commonwealth and prescribes and enforces standards of fitness for operations of motor vehicles substantially as high as those prescribed and enforced by this commonwealth.
 M.G.L. ch. 90, Sec. 10. It has not been suggested that New York failed to accord "substantially similar privileges" to Massachusetts motorists, or that harrowing tales about the devil-may-care daring of New York drivers notwithstanding--the state's "standards of fitness" fell below the Massachusetts norm.
 
 
 [9]
 Although supererogatory in light of the foregoing, it should be noted that Wagenmann was never charged with the crime of making threats, notwithstanding his statutory right to know the "true ground" for his arrest. See M.G.L. ch. 263, Sec. 1. See also Ware v. Garvey, 139 F.Supp. 71, 85 (D.Mass.1956) (fact that arresting officer "might have had another good reason but didn't intend to use [it] is no excuse for arresting for the wrong reason")
 
 
 [10]
 The defendants waffle a bit as to the burning question: the peace of whom? They suggest, variously, that the tranquility enjoyed by Linda, by the Andersons, by the residents of the neighborhood, and by the gendarmes themselves was at stake
 
 
 [11]
 No objection has been preserved on appeal to the admission of this testimony. More importantly, no limiting instruction was requested by the appellants during the trial to confine jury consideration of Stephen's statement to purposes other than the truth of the matter asserted
 
 
 [12]
 Though Yvonne did testify that Wagenmann had earlier voiced threats against the Andersons, there was no credible first-hand evidence that he had made such threats to Debbie Walsh (as Anderson claimed at trial) or to any other person in the time frame at issue
 
 
 [13]
 We limit our discussion under this rubric to the awards against the police officers and Gerald Anderson. We are aware, withal, that Healy also objects to the damages levied against him. We treat that contention infra
 
 
 [14]
 We agree that the pain and suffering incurred by reason of Wagenmann's commitment to WSH could not properly be considered an element of damages against appellant Anderson. But, unlike Anderson, we do not read the district court's remittitur order to suggest otherwise
 
 
 [15]
 We note that Healy also contests subject matter jurisdiction. Although he and the plaintiff are concededly of diverse citizenship, Healy asserts that the amount in controversy was insufficient to confer jurisdiction. Assuming--albeit without deciding--that diversity, 28 U.S.C. Sec. 1332(a), was the only basis for federal jurisdiction over this cause of action, Healy's contention is nonetheless unavailing. Because we find that Wagenmann was entitled to recover damages against the barrister well in excess of the jurisdictional minimum, see infra, this challenge collapses of its own weight
 
 
 [16]
 In his deposition, Healy asserted that he spoke with officers Pozzi and Brabbs that day. This claim was palpably untrue, and was exploded at trial. Neither Pozzi nor Brabbs was in the state courthouse when Healy was there. Both officers swore that they had no conversation with Healy at the courthouse or otherwise
 
 
 [17]
 There was no perfected objection to this instruction and no cross-appeal pertaining to it has been filed. Thus, we need not decide which party must carry the burden of proof on such an issue. We do note indications in the caselaw that, in a legal malpractice action brought because of a failure to defend against state proceedings, the defendant-attorney bears the burden of proving that, despite his negligence, the same outcome would have eventuated. See Glidden v. Terranova, 12 Mass.App.Ct. at 600, 427 N.E.2d 1169
 
 
 [18]
 The psychiatrist, it will be recalled, had found Wagenmann from the start to be "clearly competent" and to exhibit "no signs of mental illness whatsoever."
 
 
 [19]
 Healy's authorities, though off the point, do acknowledge the salience of both foreseeability and indicia of genuineness as important factors in considering whether recovery for emotional distress should be allowed. See Payton v. Abbott Labs, 386 Mass. 540, 544-57, 437 N.E.2d 171 (1982); Dziokonski v. Babineau, 375 Mass. 555, 567-68, 380 N.E.2d 1295 (1978). We note that both of these factors have been established rather conclusively in the present case
 
 
 [20]
 Insofar as Healy contends that the size of the original verdict against him ($500,000) demonstrated passion and prejudice so severe as necessarily to cast the liability finding into disrepute, we disagree. The trial judge's utilization of a remittitur was an acceptable alternative in the circumstances at bar. Inasmuch as we have lengthily discussed--and ultimately rejected--precisely this argument in respect to other similarly-situated appellants, see supra Part VI(B), we need say no more
 
 
 [21]
 The court awarded $115,866.50 in attorneys' fees and $10,852.83 in costs. The fees were allocated among the two law firms which had represented Wagenmann in this litigation, viz., Harrison & Maguire and Catanzaro, Effren & Herrick
 
 
 [22]
 Significantly, Bradley is cited for this proposition with approval in the Fees Act's legislative history. See H.R.Rep. No. 94-1558, 94th Cong., 2d Sess. 4 n. 6; S.Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5908, 5912
 
 
 [23]
 W. Shakespeare, King Lear, Act III, scene 2, 11. 58-59 (1606)
 
 
 [24]
 To be sure, we have ratified the plaintiff's claim against Healy to the post-remittitur tune of $50,000, rather than in the more munificent sum originally awarded against the lawyer by the jury. Nevertheless, because Wagenmann consented to the reduction, see supra n. 2, there is nothing he can gain by further pursuit of his cross-appeal. The point has become purely academic
 
 
 [25]
 This principle may be especially robust in a matter such as this, where the issues briefed and argued as between the plaintiff and his former attorney are quite distinct from the issues raised by the other appellants