**Pablo DE LEON LOPEZ,
Plaintiff, Appellee,**

v.

**CORPORACION INSULAR de
SEGUROS, Defendant,
Appellant.**

**No. 90–1897.**

United States Court of Appeals,
First Circuit.

Heard March 7, 1991.
Decided April 19, 1991.

Antonio M. Bird, Jr., with whom Bird, Bird & Hestres, San Juan, P.R., was on brief, for defendant-appellant.

Harold D. Vicente, with whom Vicente & Cuebas, Santurce, P.R., was on brief, for plaintiff-appellee.

Before BREYER, Chief Judge, SELYA, Circuit Judge, and BOYLE *, District Judge.

* Of the District of Rhode Island, sitting by desig-    nation.

SELYA, Circuit Judge.

Scholarly sources relate that the first English usage of the word "twin" as an adjective meaning "born at the same birth" appeared in Shakespeare's *Comedy of Errors* (1590). *See, e.g.,* XVIII Oxford English Dictionary 753 (2d ed. 1989); Barnhart Dictionary of Etymology 1178 (1988). The litigation pending before us, seeking damages for emotional distress suffered as a result of a hospital's negligence in confusing one of the plaintiff's identical twin granddaughters with another twin baby born at around the same time, is a poignant reminder of the origins of the term.

## I. BACKGROUND

The topsy-turvy tale of the traded twins began, in a biological sense, with the marriage of Juan Ramon De Leon Flores, son of plaintiff-appellee Pablo De Leon Lopez (De Leon), to Dulce M. Hernandez Ramos (Dulce). The marriage proved fruitful; on September 3, 1985, Dulce gave birth to identical twin daughters at University Hospital (the Hospital), an adjunct of the Puerto Rico Medical Center. The novice parents named their newborn twins Mari Tairi and Tairi Mari. The next day, Rosaura Hernandez Morales (Mrs. Hernandez), also a maternity patient, gave birth to fraternal twin daughters.

Dulce, while in the Hospital, presumably became familiar with her newborns during breast-feedings and by spending other time with them. She went home on September 5. The following day, she and her husband returned to retrieve their progeny. When the two girls were given to her, Dulce noticed that they did not seem identical in appearance. She asked the nurse why the babies did not "look alike." The nurse explained that infants change from one day to the next, and assured the anxious mother that the babies were indeed her twin daughters. The nurse also remarked disparagingly that Dulce must be a "primeriza," that is, a first-time mother. Their

concerns assuaged, the parents took the babies home.

Over the next year and a half, the plaintiff, who lived on St. Croix, would visit the children roughly twice a month. He became particularly attached to Tairi (who was nicknamed "La Canita" because she, unlike her sister, was blond). On April 10, 1987, fate intervened. Dulce's sister, Gloria, was at a physician's office with one of her other nieces (neither Mari nor Tairi). The niece said that she saw her cousin across the room. Gloria glanced over and saw a young girl identical in appearance to one of the De Leon twins. Gloria then approached the child's mother, Mrs. Hernandez, and told her of the coincidence. When she found out that Mrs. Hernandez had given birth to twins at the same hospital as Dulce, and in the same time frame, Gloria's suspicions blossomed.

We skip over painful details not relevant to the issues on appeal. When the two sets of twins were brought together, it became crystal clear that two of the babies had been switched. Subsequent testing determined that the identical twins belonged to Dulce and the fraternal twins, including La Canita, belonged to Mrs. Hernandez. After much agonizing, the families decided to restore each set of twins to its genetic parents. The realignment was finalized in the fall of 1987.

On April 29, 1988, De Leon filed this diversity action in the United States District Court for the District of Puerto Rico, seeking damages for his emotional distress.[1] Initially, he sued three parties, but soon dropped two of the original defendants, training his sights on Corporacion Insular de Seguros (CIS), the Hospital's malpractice insurer. CIS was named as a defendant pursuant to Puerto Rico's direct action statute, P.R.Laws Ann. tit. 26, §§ 2001–2004 (1976). In turn, CIS filed a third-party complaint against Universal Insurance Company (Universal),[2] claiming

---

1. Appellant does not dispute that, under Puerto Rico law, a cause of action for negligent infliction of emotional distress may lie in favor of a grandparent under circumstances equivalent to those at bar.

2. CIS also named Richport Insurance Company (Richport) as a third-party defendant. Richport was a predecessor-in-interest of Universal. Throughout the proceedings below, Universal represented Richport's interests and was treated

that, if the Hospital were liable for the baby-switching, primary coverage lay under the Hospital's general liability insurance policy rather than under its medical malpractice insurance policy. The plaintiff amended his complaint to include Universal as a direct defendant.

Trial began on February 26, 1990. The plaintiff's case consisted mainly of testimony by family members regarding the trauma of the discovery and their consequent suffering. To establish liability, the plaintiff relied on a res ipsa loquitur theory. In their respective defense cases, the insurers concentrated on adducing evidence anent the coverage issue. Indeed, Universal's counsel, in his opening statement, conceded that the Hospital was negligent. And while CIS did not make so explicit an admission, it did not elicit any proof tending to exculpate its insured. When all parties rested, the district judge ruled as a matter of law that the baby-switching, if negligently occasioned, fell within the Hospital's medical malpractice coverage. Accordingly, he dismissed Universal from the case. (On appeal, neither CIS nor the plaintiff contests this ruling.)

De Leon then moved for a directed verdict on negligence, arguing that CIS had presented no evidence regarding the Hospital's freedom from fault, thus leaving the jury no choice but to accept the res ipsa inference. The court indicated that it was inclined to agree. To CIS's attorney, however, the glass looked half empty rather than half full. He responded to the court's rumination by moving for a directed verdict in CIS's favor "because nothing has been established." The court granted plaintiff's motion and denied CIS's motion. The jury, given the case on the remaining issues,

returned a verdict for $800,000 in compensatory damages.

A flurry of activity followed. The plaintiff moved for attorneys' fees and prejudgment interest pursuant to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure. CIS moved, in the alternative, for judgment n.o.v., a new trial, or a remittitur. While these motions were pending, CIS launched a new offensive. It moved to dismiss the complaint on jurisdictional grounds, arguing that it could not be sued in federal court because it was entitled to eleventh amendment immunity.

On June 12, 1990, the district court filed an opinion which tied up all the loose ends. *De Leon Lopez v. Corporacion Insular de Seguros*, 742 F.Supp. 44 (D.P.R.1990). CIS's various motions were denied, conditional upon the plaintiff, within twenty days, disclaiming all damages in excess of $110,000. *Id.* at 48–49. Should the plaintiff not agree to the remittitur, a new trial limited to the question of damages would be held. *Id.* at 49. On the other side of the ledger, the court granted the plaintiff attorneys' fees and prejudgment interest on the reduced damage award. *Id.* at 48.

A considerable amount of procedural skirmishing then took place. Ultimately, the judge ruled that De Leon had seasonably accepted the remittitur and entered judgment accordingly.[3] This appeal ensued.

## II. THE ELEVENTH AMENDMENT

CIS's primary issue on appeal invokes its professed immunity under the eleventh amendment to the federal Constitution.[4] We begin this portion of our

---

as the sole general liability insurer. For simplicity, therefore, we treat the two as one and refer to them, collectively, as "Universal."

**3.** On appeal, CIS challenges the district court's decision to allow the plaintiff to accept the remittitur, claiming that the deadline contained in the court's order had expired. We see no point in reciting the interstitial details of the litigants' maneuverings below. We are satisfied that the disputed ruling was within the court's discretion. A district court, after all, is in the best position to determine whether a party's

filings are sufficient to comply with the court's own order. *See United States v. Ayer*, 857 F.2d 881, 885 (1st Cir.1988); *see also Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1066–67 (1st Cir.1987) (observing that the trial judge plays a "special role ... in elucidating the meaning and intendment of an order which he authored").

**4.** The amendment reads:

The Judicial power of the United States shall not be construed to extend to any suit in

analysis by acknowledging certain verities. The eleventh amendment, despite the absence of any express reference, pertains to Puerto Rico in the same manner, and to the same extent, as if Puerto Rico were a State. *See Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 697 (1st Cir.1983). The amendment renders a State "immune from suits brought in federal courts by her own citizens as well as by citizens of another State," *Employees of Dept. of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973), unless the State expressly waives the immunity, *see, e.g., Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974), or Congress abrogates it, *see, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). Furthermore, the salience of the provision overrides ordinary notions of procedural default; an eleventh amendment defense may be raised for the first time even on appeal to the Supreme Court. *See Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 466–67, 65 S.Ct. 347, 351–52, 89 L.Ed. 389 (1945).

■ While these truths are held to be self-evident and certain, questions nevertheless remain. Often, the pivotal issue in eleventh amendment cases involves whether a particular person or entity is to be considered "the State." Where state agencies and institutions are concerned, the applicability of the amendment "depends upon whether the entity 'is to be treated as an arm [or alter ego] of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.'" *Ainsworth Aristocrat Int'l Pty. Ltd. v. Tourism Co. of Puerto Rico*, 818 F.2d 1034, 1036 (1st Cir.1987), *quoting Mount Healthy City School Dist.*

*Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In addition to state agencies and institutions, however, eleventh amendment immunity may also attach to suits against state officials "when the state is the real, substantial party in interest." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (citation omitted). Thus, where a suit nominally against a state official would actually operate against the State, eleventh amendment immunity applies. *See id.*

■ In this instance, CIS would have us believe that the eleventh amendment redounds to the benefit of the insurer (CIS) of a state agency (the Hospital) which is itself entitled to the immunity.[5] Appellant argues, in substance, that *Pennhurst* had a wedge-like effect, widening the scope of eleventh amendment immunity sufficiently to include suits against a private actor whenever the State is the real party in interest. We cannot agree. The appellant has cited no authority (and our independent research has disclosed none) carrying *Pennhurst* to such an extreme. To be sure, the *Pennhurst* Court recognized that state officials, though not themselves "the State," act for the State when operating in their official capacities, and thus, should be entitled to immunity because their actions are in reality the State's actions. The same cannot by any stretch of the imagination be said for a private company that insures the State, any more than it could be said for any other provider of goods or services to the State. In the absence of any principled basis for treating a private insurer like a state official in this context, *Pennhurst* is of no consolation to the appellant.

■ Moreover, this case is not even a suitable vehicle for an exploration of

law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
U.S. Const. amend. XI.

**5.** The Hospital's entitlement to eleventh amendment immunity would depend, of course, on a

variety of elements. *See, e.g., Ainsworth,* 818 F.2d at 1037 (outlining factors). It is unnecessary for us to undertake this exercise, inasmuch as we assume *arguendo,* without purporting to decide, that the plaintiff could not have sued the Hospital in federal court because of an eleventh amendment bar.

whether *Pennhurst* can be read to signal a more general expansion of immunity doctrine: the appellant's self-serving characterization of itself as a nominal defendant standing in for the real party in interest (the State, or more precisely, the Commonwealth) is gravely flawed. The direct action statute under which CIS was sued provides a plaintiff with a substantive claim against an insurer separate and distinct from any claim which the plaintiff may have against the insured. *See* P.R. Laws Ann. tit. 26, § 2003; *see also Rodriguez Diaz v. Sierra Martinez*, 717 F.Supp. 27, 31 (D.P.R.1989); *Garcia v. Northern Assurance Co.*, 92 P.R.R. 236, 244 (1965); *Trigo v. Travelers Ins. Co.*, 91 P.R.R. 843, 849 (1965). Personal defenses belonging to an insured cannot, as a rule, be asserted by an insurer sued under the direct action statute. *See Cortes Roman v. Commonwealth*, 106 D.P.R. 708, 724 (1977) (Official Translation) ("insurer may not use the insured's personal defense of failure to serve notice inasmuch as said defense is for the exclusive benefit and protection of the State, not for the benefit of the insurers"); *see also Torres VDA v. Interstate Fire & Cas. Co.*, 275 F.Supp. 784, 789 (D.P.R. 1967). It follows inexorably, we believe, that when, as here, an insurer is sued under the Puerto Rico direct action statute, it cannot use the sovereign's eleventh amendment immunity as a defense. *Accord Rodriguez Diaz*, 717 F.Supp. at 31–32. Had the Puerto Rico legislature wanted insurers to be immune from suit in a federal court whenever they underwrote government agencies or institutions, the legislature could very easily have inserted an exemp-

tion to that effect into the direct action statute. In our view, the absence of such an exemption underscores the flimsiness of CIS's argument.[6]

Despite the clarity of the law, the paucity of authoritative support for its position, and the stark fact that it had previously lost an identical challenge in *Rodriguez Diaz*, CIS tries to rescue its cause by clinging to our recent decision in *In re San Juan Dupont Plaza Hotel Fire Litigation*, 888 F.2d 940 (1st Cir.1989). The effort, which distorts *Dupont* almost beyond recognition, serves only to prompt the realization that the appellant's eleventh amendment voyage can only have been fueled by desperation. For the purposes at hand, *Dupont* is less a life raft than an irrelevance.

In ruling that a State, by arranging for insurance, did not thereby forfeit eleventh amendment immunity, we wrote in *Dupont:* "If states were deemed to waive immunity by obtaining insurance, they would be forced to pay higher premiums for their insurance. Such a result would contravene the purpose of the Eleventh Amendment." *Id.* at 945. CIS wants us to stand this reasoning on its head. It exhorts that the State, via the Hospital, will bear the brunt of the judgment, even though the judgment runs exclusively against CIS, because the judgment will lead to increased malpractice premiums. Moreover, paying it will reduce the amount of coverage available for satisfaction of other claims against the Hospital arising out of the baby swap, thus leaving the

---

6. We note in passing that the direct action statute itself denies insurance companies the right to hide behind the governmental immunity of their insureds. *See* P.R.Laws Ann. tit. 26, § 2004(2) ("All such insurance policies shall provide that the insurer shall not assert the defense of governmental immunity in any action brought against the insurer under or by virtue of such policy."). CIS contends that this provision was intended to refer to municipal immunities rather than to eleventh amendment immunity. *Cf., e.g., Rodriguez v. Maryland Casualty Co.*, 369 F.Supp. 1144, 1146 (D.P.R.1971) (Bownes, J., sitting by designation) (stating, in connection with direct action against insurer of municipal hospital, that purpose of § 2004 "was

to prevent any waiver of immunity by a municipality in those cases where the damage might exceed ... the available insurance coverage"). We neither rely upon the statutory provision for our holding today nor reach the question of its effect, if any, in the eleventh amendment context. Indeed, we mention it largely because, in our view, the section demonstrates beyond any doubt that the Puerto Rico legislature understood that the direct action statute interacts with governmental immunities, and in that way the section serves to illustrate that the legislature, if it did not want the insurers of state agencies to be sued in federal court, would most likely have tailored the direct action statute to achieve that end.

State at added risk.[7]

While this description of the situational realities may be accurate, we do not see how *Dupont* enters the equation. *Dupont* confirmed that the eleventh amendment, if otherwise applicable, prevents suits in federal court against a State, even if the State is insured. There is simply no logical way to convert the case into authority for the much different proposition that the eleventh amendment shields a private (non-state) actor merely because, when the dominoes begin to fall, the entry of a judgment against the actor will potentially hurt the public fisc. *Cf. Ramirez*, 715 F.2d at 697 (that an injunction against the sovereign, affording prospective monetary relief, may have some future collateral impact on the public fisc is not anathematic to the eleventh amendment). If that were enough, then every person or firm doing business with the State would equally enjoy the prophylaxis of the eleventh amendment.

For these reasons, we reject the appellant's resupinate misreading of *Dupont* and decline its invitation radically to rewrite the eleventh amendment.

## III. RES IPSA LOQUITUR

CIS argues that the district court erred in directing a verdict in plaintiff's favor on the issue of negligence. The yardstick by which we measure whether a directed verdict should have been granted is well known. "[W]e must examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant" in order to see if "reasonable persons could reach but one conclusion." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987). In so doing, "we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Id.* In this instance, application of the yardstick demands that we investigate the dynamics of the res ipsa loquitur doctrine.

In Puerto Rico, as elsewhere, three requirements are necessary in order to bring res ipsa loquitur into play: the accident or occurrence must (1) be of a kind which does not ordinarily take place unless someone is negligent; (2) be caused by an agency or instrumentality within the defendant's exclusive control; and (3) not be due to any voluntary action on the part of the plaintiff. *See Community Partnership v. Presbyterian Hosp.*, 88 P.R.R. 379, 386 (1963). Where the doctrine flourishes, it allows the trier of fact to infer that negligence existed, causing the harm, even though direct evidence of negligent conduct is lacking. *See Colmenares Vivas v. Sun Alliance Ins. Co.*, 807 F.2d 1102, 1104–05 (1st Cir.1986) (construing Puerto Rico law).

In the ordinary case the inference of negligence is *permissive;* there is no requirement that the inference be drawn, even if the defendant offers no evidence to show that it exercised due care. *See Matta v. Pueblo Super Mkt., Inc.*, 80 P.R.R. 498, 501 (1958) (res ipsa loquitur "only creates a rebuttable inference of negligence that allows or authorizes the conclusion that the accident was caused by the negligence of the defendant, but in no way obliges the trier to conclude that there was negligence"). Hence, while a vital res ipsa loquitur inference enables a plaintiff to reach a jury, more is required before the judge can take the issue of negligence from the jury. We conclude that, consistent with Puerto Rico's precedents and with the theoretical underpinnings of the doctrine, the proof will be held to support an instructed verdict for the plaintiff only if (1) the three predicate requirements for a res ipsa inference exist, (2) the defendant offers no evidence to rebut the inference, and (3) the inference is so strong that no reasonable jury could fail to embrace it. *Accord Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 837 (4th Cir.1987) (applying federal law in FELA case); *see also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 40, at 258 (5th ed. 1984). Although the

---

7. Other suits arising out of this unhappy occurrence were filed in the Puerto Rico courts, including claims on behalf of both sets of parents.

In those cases, both CIS and the Hospital were named as defendants.

test is a stringent one, we believe that it was met in this instance.

■ We discuss the three prongs of the directed verdict test in the ensemble, considering the state of the evidence as to each of the three res ipsa predicates, the proof offered by CIS, and whether, on the whole record, the res ipsa loquitur inference upon which the plaintiff relied was so compelling that no reasonable juror could fail to draw it.

The first element of res ipsa loquitur contemplates that the occurrence would normally not take place in the absence of negligence. The case at bar unquestionably qualifies under this rubric. Maternity hospitals have a well-defined mission, carried out by professionals in a controlled environment. Common sense dictates that babies will not be switched unless due care is by the boards. Indeed, CIS has been totally unable to suggest how the mix-up could have happened without negligence attributable to the Hospital. In a videotape which was introduced into evidence, two physicians who, at the time of trial, held high-ranking positions at the Hospital, admitted that a mistake had occurred and that the Hospital was responsible for correcting it. *See De Leon Lopez,* 742 F.Supp. at 45 n. 2. Moreover, testimony regarding standard hospital procedure in identifying babies was introduced, making it painfully apparent that a swap could not have eventuated in the absence of negligence. And at oral argument in this court, CIS's counsel, under direct questioning, was unable even to suggest any way in which the occurrence could have happened without negligence on the part of the insured.

The second requirement for res ipsa loquitur is exclusive control of the instrumentality. Here, the Hospital was solely in charge of safekeeping and tending the infants in its care. It dominated the environment, exercising pervasive control over what transpired in the wards, in the nursery, and elsewhere on the premises. Each mother was, of course, allowed to hold and feed her children, but neither Dulce nor Mrs. Hernandez had any access to the other's babies. Moreover, the very fact that Dulce left the Hospital a day before the children were discharged reinforces the inescapable conclusion that, from the time the twins were born until the time they were delivered to their parents, the newborns were in the custodial care of Hospital. In this case, there was exclusive control.

The third requirement for res ipsa loquitur—that the plaintiff be free of voluntary responsibility for the occurrence—was likewise satisfied. The grandfather is the plaintiff here. He could not have had anything to do with confusing the babies' identities, as he was not even in Puerto Rico during the relevant period.

■ The record also reveals that the defense offered no evidence either to refute the inference of negligence or to suggest a possible cause of the accident apart from the Hospital's negligence.[8] As the district court wrote in denying CIS's motion for judgment n.o.v.: "[CIS] did not attempt in any way at trial to counter or rebut plaintiff's evidence of the hospital's negligence.... During trial, [CIS] presented no fact witnesses or expert witnesses regarding the alleged negligence of the hospital...." *Id.* at 46. In truth, perscrutation of the trial transcript leaves the indelible impression—confirmed by the trial court, *see id.*—that, from the outset, the apparent strategy of each insurance company was aimed at convincing the court that the other carrier's policy, rather than its own, afforded coverage. Tort liability was treated almost as a foregone conclusion.

---

**8.** The only other causative factor that is even intimated in the record revolves around Dulce's conduct. Appellant blames her for not vigorously challenging the nurse who handed over the two non-identical babies three days after birth. This is at best a makeweight. To the extent that the conduct of the mother can be seen as a contributory cause, or possibly a failure to mitigate damages, neither view of the evidence would make res ipsa loquitur inapplicable vis-a-vis the Hospital, as the doctrine's reach is not restricted to cases where only one actor could be responsible. *See Colmenares Vivas,* 807 F.2d at 1106.

To sum up, exploration of the legal landscape leading to the directed verdict reveals no obstacles of any kind. This is one of the hen's-teeth rare instances in which the res ipsa loquitur inference is both uncontroverted and incontrovertible. In our estimation, no reasonable juror could find, on this record, that the babies were switched without negligence on someone's part. By the same token, no reasonable jury, on these facts, could find any other cause for the switch, *see Community Partnership*, 88 P.R.R. at 393–94 ("in order that some other cause of the accident may render inapplicable the *res ipsa loquitur* doctrine, such doctrine must not be based on a mere possibility of causation but must be of the category of cause with probability of effects"); *cf., Comedy of Errors, supra*, act II, sc. i ("Every why hath a wherefore."), or could arrive at any conclusion other than that the Hospital was blameworthy. Hence, an instructed verdict for the plaintiff on the negligence issue was fully appropriate.

## IV. EXCESSIVE DAMAGES

The appellant's challenge to the amount of the damage award, pressed even after the verdict was substantially reduced by the judge, casts far more heat than light. Cutting through the mass of purple prose and perfervid rhetoric, the appellant's core argument is that the jury was inflamed by passion and prejudice to such an extent that a court-ordered remittitur could not effect a cure. Given the posture of this case, such a thesis seems odd. We recognize, of course, that a remittitur may not be the proper anodyne if the "jury's original overestimation of the damages indicated a passion or prejudice so virulent as to nullify the verdicts entirely." *See Wagenmann*, 829 F.2d at 216–17. But that rule protects against the potential contamination of a jury's liability findings. Here, the trial judge took the liability issue from the jury, directing a verdict. A fortiori, neither passion nor prejudice on the jury's part could possibly have influenced the outcome on liability.

Stripped of its veneer, CIS's argument reduces to the assertion that the jurors' passion and prejudice infected the award of damages itself. This argument goes in a complete circle. To the extent that the proposition may reflect the true facts (a topic on which we need not speculate), it overlooks that the very purpose of a remittitur is to neutralize passion and prejudice insofar as such attributes may have caused an inflated jury award. And when the trial judge performs verdict surgery of this kind, an appellate court must be slow to interfere with the operation's outcome. The reason is apparent. We have remarked on earlier occasions that "it is surpassingly difficult on the basis of an algid appellate record to quantify money damages for intangible losses." *Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir.1991). When, as here, the plaintiff's injuries fall within this rubric, and there exists no truly objective way to measure damages, the trial judge's view is entitled to considerable deference. *See, e.g., Wagenmann*, 829 F.2d at 215–16. In other words, the scope of appellate review of post-remittitur damages for non-economic losses is extremely narrow and the ambit of the trial court's discretion is correspondingly broad. *See id.*

To be sure, there may be instances where the damages are so speculative, and the information available to the judge so gauzy, that he cannot properly fix a remittitur amount. *See Betancourt v. J.C. Penney Co.*, 554 F.2d 1206, 1209 n. 5 (1st Cir.1977). Nevertheless, it strains credulity to brand this as such a case. The evidence, albeit not mathematically precise, was adequate both to permit the fixing of a remittitur amount and to underbrace the $110,000 figure. The plaintiff showed that, for over a year and a half, he was unaware of the baby swap; that during the period of his blissful ignorance, he grew very close to La Canita; and that, when the mistake was discovered, he suffered emotional trauma related both to his own loss and to watching his son and daughter-in-law undergo so wrenching an experience. The court considered this evidence and careful-

ly factored into the equation the circumstances highlighted by the defense: that no medical or other expert testimony was presented in connection with the damage claim; that De Leon contracted no lasting physical or mental impairment; that he only saw his granddaughters twice a month before the mix-up was discovered; and that, afterwards, he maintained his relationship with La Canita to the degree possible. *See, e.g., De Leon Lopez*, 742 F.Supp. at 47. The judge then concluded that the jury's original award was overlarge and shrunk it to what he considered an appropriate size. *Id.* Mindful of the painstaking balancing the court employed, we do not think that its paring of the verdict can successfully be challenged on appeal.

In cases like this, juries and trial judges face an unenviable task. It is agonizingly hard to place a monetary value on a grandparent's misplaced affection, or on loss of contact with a descendant during her formative years, or on the emotional turmoil attendant to disruption of one's nuclear family. To pretend that this translation of distress into dollars does not involve a certain amount of guesswork would be to ignore the obvious. Yet the jury system, which depends heavily on the common sense and collective human experience of jurors for a fair resolution of such quandaries, has rendered yeoman service. When, as in this case, the damages awarded by the jury have been subjected to thorough scrutiny by the nisi prius court and the sum that the defendant will ultimately have to pay does "not exceed the outermost total which, by a process of rational appraisal, could fairly be said to flow from the evidence adduced at trial," *Ruiz*, 929 F.2d at 35, the court of appeals has no

warrant to insist upon a retrial or to reduce the award still further. *Accord, e.g., Clark v. Taylor*, 710 F.2d 4, 14 (1st Cir. 1983) (verdict should not be disturbed so long as it falls "within the universe of possible awards that are supported by the evidence").

## V. INTEREST AND FEES

■ CIS's final assignment of error relates to prejudgment interest and attorneys' fees.[9] These embellishments were added to the verdict by the court pursuant to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure.[10] Under these provisions, a losing party who has been "obstinate" during the course of a lawsuit can be held liable for prejudgment interest (if a money judgment has eventuated) and for its adversary's attorneys' fees. In diversity cases where Puerto Rico law supplies the rule of decision, the federal court must utilize these provisions. *See Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926, 934 (1st Cir.1991); *Pan American World Airways, Inc. v. Ramos*, 357 F.2d 341, 342 (1st Cir.1966); *see also Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830, 841 (1st Cir.1990) ("In a diversity case, state rather than federal law controls the question of attorneys' fees.").

■ A finding of obstinacy requires that the court determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay. *See La Playa Santa Marina, Inc. v. Chris–Craft Corp.*, 597 F.2d 1, 7 (1st Cir.1979); *Soto v. Lugo*, 76 P.R.R. 416, 419 (1954). We re-

---

9. The rate and period of prejudgment interest were tabulated in accordance with local laws. *See De Leon Lopez*, 742 F.Supp. at 49. Attorneys' fees of $15,000 were awarded. *Id.* CIS contests the imposition of interest and fees *per se*, but does not quarrel with the amounts assessed.

10. The Puerto Rico Rules provide in pertinent part:

In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person

the payment of a sum for attorney's fees which the court decides corresponds to such conduct.

P.R.Laws Ann. tit. 32, App. III, Rule 44.1(d) (1988 Supp.).

The court shall also impose on the party who has acted imprudently the payment of interest at the rate of twelve (12) percent per annum ... from the filing of the suit in all suits for damages, and up to the date [of judgment].....

*Id.*, Rule 44.3(b).

view the trier's determination of whether a party has been obstinate in a deferential manner, using an abuse-of-discretion approach. *See, e.g., Marshall v. Perez Arzuaga,* 828 F.2d 845, 852 (1st Cir.1987), *cert. denied,* 484 U.S. 1065, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988). Here, the district court made explicit findings relative to appellant's "unreasonable pertinaciousness," its "stubbornly litigious" posture, its "inordinate" insistence on indefensible positions, its stalling tactics, and its disregard of court orders. *De Leon Lopez,* 742 F.Supp. at 48. These findings were amply bottomed and justified the imposts under Puerto Rico law.

## VI. CONCLUSION

We need go no further. The record shows, beyond any legitimate question, that the Hospital was negligent and that its negligence set into motion a particularly unfortunate chain of events; thus, the court below did not err in directing a verdict on liability. The defendant must pay for the Hospital's negligence (as a private actor, it cannot assert the defense of eleventh amendment immunity). The amount to be paid, as pared by the judge, does not shock our collective conscience. Nor are we troubled by the incremental imposition of prejudgment interest and attorneys' fees, which, being in direct response to defendant's intransigence and obduracy, was well within the lower court's discretion. After all, to close as we began, he that elects to sup with the devil "must have a long spoon." *Comedy of Errors, supra,* act IV, sc. iii.

*Affirmed.*